**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:

Premier Assurance Group SPC Ltd.,

    Debtor in a Foreign Proceeding.

Chapter 15
Case No. ___20-20230___ -___

**VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING**
**AND MOTION FOR ORDER GRANTING RELATED RELIEF**
**PURSUANT TO 11 U.S.C. §§ 1515, 1517, 1520 and 1521**

Petitioners Jeffrey Stower and Jason Robinson of KPMG Cayman Islands, the duly

authorized and appointed joint controllers (in such capacity, the "Joint Controllers" or "Foreign

Representatives") of Premier Assurance Group SPC Ltd., (In Controllership), a Cayman Islands

exempted segregated portfolio company (the "Debtor"), in controllership commenced by the

appointment of the Joint Controllers by the Cayman Islands Monetary Authority ("CIMA") on

September 14, 2020 and later confirmation of the Joint Controllers' powers on September 21, 2020

by the Grand Court of the Cayman Islands (the "Cayman Court"), CAUSE NO: FSD 210 OF 2020

(the "Foreign Proceeding"), respectfully submit this verified petition (the "Verified Petition") in

furtherance of the form of voluntary petition [ECF No. 1] (the "Voluntary Petition," together

with the Verified Petition, the "Petition") filed concurrently herewith, and hereby request that the

Court enter an order substantially in the form annexed hereto as Exhibit A (the "Proposed Order"),

pursuant to sections 1515, 1517, 1520 and 1521 of title 11 of the United States Code (the

"Bankruptcy Code"):[1]

    a)      recognizing the Joint Controllers as the foreign representatives, as defined in

---

[1]    Unless otherwise noted, all sections referenced herein refer to sections of the Bankruptcy Code.

section 101(24), of the Debtor with respect to the Foreign Proceeding;

b)      granting recognition, pursuant to section 1517, of the Foreign Proceeding as a foreign main proceeding, as defined in section 1502(4), with respect to the Debtor, or in the alternative, as a foreign nonmain proceeding as defined in section 1502(5);

c)      if the Foreign Proceeding is recognized as a foreign main proceeding, granting automatic relief as of right upon recognition of a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code;

d)      granting such other and further relief and additional assistance as set forth below under sections 1521 and 1507; and

e)      finding that the interests of creditors and other interested entities, including the Debtor, are sufficiently protected under section 1522.

In support of this request, the Joint Controllers, based on (a) our personal knowledge, (b) our review of certain documents and (c) publicly available information, refer the Court to the verified statements in this Verified Petition, and further respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtor is a Cayman Islands exempted segregated portfolio company, registered in the Cayman Islands and regulated by CIMA.  The Debtor is a wholly owned subsidiary of Premier Assurance Group, LLC and has two segregated portfolios.  The principal activity of the Debtor's segregated portfolios is to insure events associated with human life. To this end they offer life insurance and health insurance products.

2.       On September 3, 2020, the executive committee of CIMA, for reasons described below, including being of the opinion that the Debtor is or appears likely to become unable to meet its obligations as they fall due, passed a resolution providing for the appointment of a person to assume control of the Debtor's affairs. On September 14, 2020, in furtherance of this resolution, CIMA appointed the Joint Controllers under section 24(2)(h) of the Cayman Islands Insurance Law (the "Insurance Law") to assume control of the affairs of the Debtor. On September 17, 2020

the Joint Controllers petitioned the Cayman Court for confirmation of their powers.[2] On September 21, 2020, following a substantive hearing, the Cayman Court issued an order authorizing the Joint Controllers to exercise powers granted to them under section 24(2)(h) of the Insurance Law, including certain powers analogous to those under the Bankruptcy Law and one power (that is, the power to propose a scheme of arrangement) that is a process pursued in accordance with the Companies Law (which also contains the statutory scheme for the winding up of solvent and insolvent Cayman Islands companies (which include segregated portfolio companies) and the determination of creditor claims in that context).[3]

3.      The Joint Controllers commence this Chapter 15 case to fulfill the statutory duties imposed upon them to assume control of the affairs of the Debtor and to protect the interests of its policy holders and creditors pursuant to their appointment under section 24(2)(h) of the Insurance Law.

4.      By way of this Petition the Joint Controllers seek recognition of the Foreign Proceeding as a foreign main proceeding with respect to the Debtor, or in the alternative, as a foreign nonmain proceeding.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider this Petition pursuant to sections 157 and 1334 of title 28 of the United States Code. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

6.      This case (the "Chapter 15 Case") has been properly commenced pursuant  to

---

[2]    Attached to the Voluntary Petition as Attachment 1 is a true and correct copy of the petition filed in the Cayman Court on September 17, 2020 (the "Cayman Petition").

[3]    Attached to the Voluntary Petition as Attachment 2 is a true and correct copy of the order entered by the Cayman Court on September 21, 2020 (the "Cayman Order").

section 1504 of the Bankruptcy Code by the filing of the Petition for recognition of the Foreign

Proceeding as a foreign main proceeding with respect to the Debtor, or in the alternative as a

foreign nonmain proceeding, pursuant to section 1515 of the Bankruptcy Code.

7.     Venue is proper in this Court pursuant to section 1410 of title 28 of the United

States Code, because the Debtor's principal assets in the United States are located within this

district. In particular, to the best of the Joint Controllers' knowledge based on review of books

and records of or relating to the Debtor, 65% of the Debtor's total investments are located within

this District, as follows (all amounts shown in US dollars):

a)     $51,081,745, or 53%, are held with Insigneo Bank with headquarters located at 777 Brickell Avenue, 10th Floor, Miami, FL 33131;

b)     $3,891,978, or 4%, are held in the form of four commercial condominium units in Miami, Florida; and

c)     $8,112,158, or 8%, are notes receivable due from Silverback Capital Partners LLC of 1901 Ponce De Leon Blvd. Coral Gables, FL 33134.

d)     The remainder of the investments are believed to include accounts with UBS Bank, Jefferies LLC, Interactive Brokers and the U.S. Department of Treasury. The Joint Controllers are also aware of bank accounts held at UBS Financial Services Inc., Valley National Bank and Bank of America.

8.      Sections 1501, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code provide

the statutory predicates for the relief requested.

## RELIEF REQUESTED

9.     The Joint Controllers request that this Court enter an order, substantially in the form

of the Proposed Order attached hereto and pursuant to sections 1501, 1515, 1517, and 1520 of the

Bankruptcy Code:

a)     recognizing the Joint Controllers as the foreign representative of the Debtor, as that term is defined in section 101(24) of the Bankruptcy Code, with respect to the Foreign Proceeding;

b)     recognizing the Foreign Proceeding as a foreign main proceeding, or in the

alternative, as a foreign nonmain proceeding, with respect to the Debtor, pursuant to section 1517(b) of the Bankruptcy Code;

c)   if the Foreign Proceeding is recognized as a foreign main proceeding, granting automatic relief as of right upon recognition of a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code;

d)   granting such other and further relief and additional assistance as the Court deems just and proper under sections 1521 and 1507 of the Bankruptcy Code including:

   i)    granting a stay of actions, proceedings and execution against the Debtor's assets under sections 1521(a)(1) and 1521(a)(2) of the Bankruptcy Code;

   ii)   suspending the right to transfer, encumber or otherwise dispose of the Debtor's assets without the consent of the Foreign Representatives under section 1521(a)(3) of the Bankruptcy Code;

   iii)  providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities under section 1521(a)(4) of the Bankruptcy Code;

   iv)   entrusting the administration of the Debtor's assets within the United States to the Joint Controllers under section 1521(a)(5) of the Bankruptcy Code; and

   v)    under section 1521(a)(6) of the Bankruptcy Code, to the extent such relief has been previously granted, making final provisional relief granted under section 1519(a).

e)   granting such other and further relief and additional assistance as the Court deems just and proper.[4]

## BACKGROUND

### A.   History and Operations of the Debtor

10.   The Debtor is an exempted segregated portfolio company duly incorporated under the laws of the Cayman Islands on June 29, 2012.  It maintains its registered office and headquarters in the Cayman Islands and is regulated by CIMA, a regulatory body in the Cayman

---

[4]   The Joint Controllers reserve the right to seek such other and further provisional and final relief and additional assistance from this Court, under sections 1507, 1519 and 1521 of the Bankruptcy Code.

Islands with jurisdiction over, and responsibility for various regulatory functions, which include (but are not limited to) enhancing market confidence, consumer protection, the reputation of the Cayman Islands as a financial centre and endeavouring to reduce the possibility of financial services businesses being used for the purpose of money laundering. It is the holder of a Class "B" Insurer's License granted by CIMA on July 4, 2012 pursuant to section 4 of the Insurance Law (2008 Revision).

11.     Lainston International Management Limited (the "Insurance Manager") which is based in the Cayman Islands and regulated by CIMA is the Debtor's insurance manager. In addition, the Debtor's audits as at December 31, 2019 were commissioned and conducted by RSM Cayman Ltd. (the "Auditor") which is based in the Cayman Islands.

12.     The Debtor is a wholly owned subsidiary of Premier Assurance Group, LLC. It has two segregated portfolios, Premier Assurance Segregated Portfolio ("PASP") and Global Assurance Segregated Portfolio ("GASP"), which were formed on September 13, 2012. A "segregated portfolio company" ("SPC") is a single legal entity, but it may create segregated portfolios in order to segregate the assets and liabilities held within or on behalf of one segregated portfolio from the assets and liabilities held within or on behalf of another segregated portfolio or the assets and liabilities of the SPC which are not held within or on behalf of any segregated portfolio. In relation to a segregated portfolio, its assets are only available to meet the liabilities to the creditors and shareholders in respect of that segregated portfolio and who shall be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio for such purposes.  A segregated portfolio's assets are not available or used to meet liabilities to, and shall be absolutely protected from, creditors and shareholders in respect of another segregated portfolio and who accordingly shall not be entitled to have recourse to the first mentioned segregated

portfolio's assets. The principal activity of the Debtor's segregated portfolios is to insure events associated with human life. It offers life insurance, and health insurance products which provide coverage on a global basis. The products are offered globally with the exception of United States citizens and residents. All products are sold to markets in the Latin American, Caribbean (except the Cayman Islands), European and Asian regions.

13.    The current directors of the Debtor are Jorge Eduardo Falcon ("Mr. Falcon"), Leonardo Cornide ("Mr. Cornide"), Luis J. Lauredo and Alcides Isidoro Avila. Mr. Cornide and Mr. Falcon, are the founding directors and shareholders (the "Founders"). The Founders each hold a 50% beneficial interest in the Debtor.

**B.    Events Precipitating Commencement of the Foreign Proceeding and Appointment of the Joint Controllers**

14.    In connection with the Cayman Proceeding, Audrey Roe, the Head of the Compliance Division of CIMA ("Ms. Roe") has submitted an affidavit under oath[5] to the Cayman Court to the effect that, on June 25, 2019, CIMA was informed by the Founders, in response to direct questioning, that Premier Assurance Group, LLC, the Debtor's direct parent, had been under investigation by the United States Securities and Exchange Commission (the "SEC") since August 2017. CIMA would later become aware that on September 25, 2019, the SEC had settled cease-and-desist proceedings against the Founders for using investment funds to obtain personal loans and for failing to disclose their personal interest in transactions in which they used additional investment funds. Ms. Roe further averred that the Founders had misrepresented the scope of the SEC investigation by failing to disclose that they were personally subject to investigation when in fact the SEC's findings were ultimately made against the Founders in their personal capacities rather than against Premier Assurance Group, LLC as the Founders' initial response to CIMA

---

[5] Such affidavit, dated September 17, 2020 (the "Roe Affidavit"), is attached as Exhibit B to this Verified Petition.

would have suggested.

15.     Specifically, Ms. Roe averred that the SEC found evidence to suggest that the Founders had used the Debtor as a personal "piggy bank", namely that the Founders, had, in their capacity as investment advisers to the Debtor, advised the Debtor to invest up to 25% of its investment reserves in a note with Silverback Capital Partners, LLC ("Silverback"), an entity which is also owned and controlled by the Founders. Silverback would then make personal loans back to the Founders totaling over $7 million from the funds borrowed from the Debtor. Ms. Roe averred that the SEC also stated that this arrangement represented a clear conflict of interest and breach of fiduciary duty on the part of the Founders who had failed to properly disclose material conflicts.

16.     Ms. Roe averred that the SEC issued an order that ultimately found the Founders responsible for a violation of the Investment Advisors Act of 1940 and, without admitting or denying the SEC's findings, the Founders agreed to a cease-and-desist order and to pay over $7 million in disgorgement and civil penalties.

17.     With respect to the financial health of the segregated portfolios, Ms. Roe averred that GASP has had a long history of balance sheet insolvency that has required enhanced regulatory supervision from CIMA since 2016. In particular, on April 10, 2019, CIMA directed the Debtor to cease writing business through GASP and to take steps to ensure that GASP remained solvent.

18.     Ms. Roe further averred that such steps were not taken as promised and, furthermore, that the Auditor had informed CIMA following their 2019 audit that, among other things they were concerned that :

a)   GASP had violated CIMA's order not to write new business;

b)   the Debtor had established some form of "rent-a-cell" arrangement in another

jurisdiction from which it had begun writing its health insurance business;

c)  the Debtor intended to set up a new segregated portfolio structure in the same jurisdiction as the new so called "rent-a-cell" arrangement; and

d)  the Debtor would eventually transfer GASP's entire book of business to the newly created structure.

19.     Indeed, Ms. Roe averred that, on August 31, 2020, the Debtor submitted a business plan to CIMA that proposed to terminate GASP, which, according to the Auditor in its notes to the 2019 audited financial statements, was no longer a going concern despite the fact that the directors continued to insist that GASP had the resources to continue business into the foreseeable future.

20.     Separately, Ms. Roe averred that CIMA has received a number of complaints by GASP's policy holders over the delayed settlement of claims, which have included allegations of fraud and refusal to return calls or emails against the Debtor.

21.     With respect to PASP, Ms. Roe averred that CIMA had received audited financial statements for fiscal year 2019 from the Auditor that demonstrated that PASP was solvent, however, the financial statements contained a "*Disclaimer of Opinion*" in which the Auditor stated that it had not obtained sufficient appropriate audit evidence to provide the basis for an audit opinion on the financial statements. In particular, the Auditor pointed to the inclusion of a COVID-19 adjustment in projecting loss reserves and the use of an unapproved discounted cash flow methodology. Ms. Roe further averred that the Auditor had expressed concern that the Debtor was unable to provide sufficient assurance regarding the recovery of approximately $10 million in receivables.

22.     Ms. Roe averred that the Auditor had also informed CIMA that:

a)  the shareholders of the Debtor intended to sell PASP;

b) the Debtor had explicitly expressed to them, a desire to redomicile from the Cayman Islands and that the Auditors held a real fear that the Debtor and its directors would walk away leaving policy holders at risk; and

c) in the Auditor's belief, "*Premier, as an entity could implode and CIMA need to think how they deal with the Company in the short to medium term. One option would be to immediately close the Company down and place it into liquidation.*"

23.    Ms. Roe averred in summary that, the facts and other observations outlined above were of grave concern to CIMA and suggested that the Debtor and its directors were:

a) manipulating financial statements by understating reserves and overstating assets;

b) operating an insolvent segregated portfolio (GASP) which is struggling to pay its claims;

c) in the process of relocating the book of business currently written by GASP to another jurisdiction;

d) in the process of selling PASP without informing CIMA;

e) in breach of CIMA's order to cease-and-desist from writing further business through GASP; and

f) in breach of the Insurance Law.

24.    Ms. Roe further averred that, when taken in conjunction with the misrepresentations made to CIMA and the facts uncovered by the SEC investigation, the integrity of the Debtor's directors is severely undermined and it appears that they are preparing to dissipate the remaining assets of the Debtor, causing serious harm to the Debtor's policy holders and creditors.

25.    In light of the above, on September 3 2020, the Executive Committee of CIMA (referred to as "the Authority" therein) passed a resolution with respect to the operation of the

10

Debtor (referred to as "the Company" therein) stating that:

> [P]ursuant to section 24(1)(a), (b), (d), (f) and (g) of the [Insurance Law], the Authority is of the opinion that [the Debtor] (1) is or appears likely to become unable to meet its obligations as they fall due; (2) is carrying on business in a manner detrimental to the public interest and to the interest of its creditors and policyholders, (3) has contravened the [Insurance Law], (4) the direction and management of [the Debtor's] business has not been conducted in a fit and proper manner, and (5) Jorge Eduardo Falcon and Leonardo Cornide are not fit and proper persons to hold the position of director of [the Debtor]
>
> AND THAT therefore pursuant to section 24(2)(h) of the [Insurance Law], the Authority hereby appoints, at the expense of [the Debtor], a person to assume control of the[Company's affairs. Accordingly, such person shall have all the powers necessary to administer the affairs of [the Debtor] including power to terminate the insurance business of a licensee.

26.     On September 14, 2020, in furtherance of this resolution, and pursuant to notice issued under section 24(2)(h) of the Insurance Law[6], CIMA appointed the Joint Controllers to assume control of the Debtor's affairs and to have all the powers necessary to administer the affairs of the Debtor, including the power to terminate the insurance business of the Debtor.

27.     The Appointment Notice further directed the Joint Controllers to assess whether any applications should be made to the Cayman Court to protect the interests of policy holders and creditors of the Debtor.

28.     Upon appointment, the Joint Controllers were advised by CIMA that there is a real risk of a dissipation of the Debtor's assets if the directors of the Debtor are alerted to the appointment of the Joint Controllers before steps have been taken to secure or otherwise freeze the Debtor's assets, all or substantially all of which are located in the United States.

---

[6] Attached to the Voluntary Petition as Attachment 3 is a true and correct copy of the notice issued under section 24(2)(h) on September 14, 2020 (the "Appointment Notice").

C.    **Commencement of the Foreign Proceeding**

29.    On September 17, 2020, the Foreign Proceeding was commenced by filing the Cayman Petition with the Cayman Court seeking confirmation of the powers exercisable by the Joint Controllers to administer the affairs of the Debtor.  A hearing was scheduled on the Cayman Petition.

30.    On September 21, 2020, following a substantive hearing, the Cayman Court entered the Cayman Order providing that pursuant to, but without limiting the powers granted to the Joint Controllers under section 24(2)(h) of the Insurance Law, the Joint Controllers are authorized to exercise certain powers without further leave of the Cayman Court.

31.    In particular, the Cayman Court authorized the Joint Controllers to commence proceedings under Chapter 15 of the United States Bankruptcy Code for the recognition of their appointment as Joint Controllers and to commence any other winding up, bankruptcy, or recognition proceedings in the United States, Panama, Malaysia, or any other jurisdiction in which the Debtor has assets as the Joint Controllers consider necessary and appropriate. *See* Cayman Order ¶ 1(c).

32.    The Cayman Court further authorized the Joint Controllers to, among other things as more fully laid out in Attachment 2 to the Voluntary Petition, determine the debts and claims of creditors and policyholders; propose a scheme of arrangement after consultation with CIMA or make such compromise or other arrangement as may be thought expedient with creditors of the Debtor; safeguard the interests of the Debtor's investors or creditors; enter into discussions and negotiations with any person in the Cayman Islands or elsewhere as necessary to arrive at a prompt and orderly resolution of the Debtor's financial problems; and have liberty to apply to the Cayman Court. *See* Cayman Order ¶¶ 1(h), 1(d)(iii), 1(f), 1(k), 8.

12

**D.**     **Commencement of this Chapter 15 Case**

33.     In furtherance of their duties, the Joint Controllers hereby seek recognition of the Foreign Proceeding to fulfill the statutory duties imposed upon them to assume control of the affairs of the Debtor and to protect the interests of its policy holders and creditors pursuant to their appointment under section 24(2)(h) of the Insurance Law, including to secure or otherwise freeze assets located in the United States against the risk of dissipation once the appointment of the Joint Controllers becomes known.  Without recognition of the Foreign Proceeding as a foreign main proceeding, or in the alternative, a foreign nonmain proceeding, the Joint Controllers' duties will be frustrated.

34.     Concurrently with the filing of the Petition, the Foreign Representatives have moved for a temporary restraining order and preliminary injunction, pending the Court's determination on recognition of this Petition, requesting that the Foreign Representatives be entrusted with the administration or realization of all of the Debtor's assets located in the United States, permitting the examination of witness, the taking of evidence or the delivery of information concerning the Debtor's assets, affairs, rights, obligations or liabilities, and suspending the right of any person or entity to transfer, encumber or otherwise dispose of any assets of the Debtor except as expressly authorized by the Joint Controllers.  Foreign Representatives are requesting this provisional relief in order to safeguard the Debtor's assets and the interest of creditors.

## BASIS FOR RELIEF

**A.**     **The Court Should Recognize the Foreign Proceeding as a Foreign Main Proceeding, and the Joint Controllers as the Duly Authorized Foreign Representative of the Debtor with Respect thereto**

35.     The purpose of Chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "Model Law") so as to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a). Thus:

13

> The language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law. Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions.

*In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); *see also Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768 F.3d 239, 245 (2d Cir. 2014) (quoting statute); *In re British Am. Ins. Co.*, 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in interpreting Chapter 15, a court is to "consider its international origin, and the need to promote an application of [Chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.[7]

36.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding or, in the alternative, as a foreign nonmain proceeding if (1) such foreign proceeding is a foreign main or nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a); *In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  The foregoing requirements are satisfied with respect to the Foreign Proceeding, the Joint Controllers, and the Petition.

## B.    The Foreign Proceeding is a Foreign Main Proceeding

37.    The Foreign Proceeding is a foreign main proceeding and therefore satisfies the

---

[7]    The legislative history notes that "[i]nterpretation of [Chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th SESS. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." H. REP. No. 109- 31, PT. 1, 109th Cong., 1st SESS. 109-110 (2005).

conditions for entry of an order recognizing such a proceeding under section 1517(a).

          *i.*    *The Foreign Proceeding is a "foreign proceeding" under the Bankruptcy Code*

38.    The Foreign Proceeding is a "foreign proceeding" for purposes of Chapter 15 of the Bankruptcy Code. Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." *See* 11 U.S.C. § 1502(3).

39.    The Foreign Proceeding meets each element of the definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code. Specifically, certain of the powers of the Joint Controllers confirmed in the Cayman Proceeding are analogous to those under the Bankruptcy Law and one power (that is, the power to propose a scheme of arrangement) is a process pursued in accordance with the Companies Law (which contains the statutory scheme for the winding up of solvent and insolvent Cayman Islands companies (which include segregated portfolio companies) and the determination of creditor claims in that context). *See* Cayman Order ¶ 1.

40.    The Foreign Proceeding is also "collective" in nature. As noted above, the Cayman Order gives the Joint Controllers the power to, among other things, and in certain cases in consultation with CIMA, determine claims, refer claims to an arbitrator, control and collect assets, take actions to safeguard the interests of the Debtor's policy holders and creditors and to make such compromises or arrangements as may be thought expedient with creditors including proposing a scheme of arrangement pursuant to the Companies Law. *See* Cayman Order ¶¶ 1(d)(i),

1(d)(iii), 1(d)(iv), 1(e), 1(f), 1(h).  In addition, the Cayman Court has retained jurisdiction to address disputes and resolve issues concerning the powers of the Joint Controllers. *See id.* ¶ 8 ("[t]he Joint Controllers, [CIMA], and creditors and policyholders of the Company shall have liberty to apply").[8]

41.    As noted above, on September 17, 2020, the Joint Controllers commenced the Foreign Proceeding by filing the Cayman Petition with the Cayman Court, and on September 21, 2020 the Cayman Court entered the Cayman Order.  Thus, the Foreign Proceeding has been properly commenced and is pending in a foreign country.

42.    The Foreign Proceeding is a judicial proceeding in that it is supervised by CIMA and the Cayman Court. Specifically, the Foreign Proceeding is subject to "control or supervision by a foreign court" as the Joint Controllers had to apply and obtain an order from the Cayman Court confirming their powers to control the affairs of the Debtor, the Joint Controllers are required to prepare and file with CIMA and the Cayman Court reports with respect to the affairs of the Debtors and the Joint Controllers and other parties in interest, including creditors and policyholders, have liberty to apply to the Cayman Court pursuant to the terms of the Cayman Order. *See* Cayman Order ¶¶ 6, 7, 1(n), 8.

43.    Although the typical Cayman insolvency proceeding is conducted under the Companies Law (and, as previously noted, the Joint Controllers have been expressly granted the power to propose a scheme of arrangement, a process pursued squarely in accordance with the Companies Law) courts have also held that insolvency proceedings under the Bankruptcy Law, as to which the Joint Controllers have been granted certain analogous powers as outlined above, and other similar laws satisfy section 101(23)'s requirements. *See*, *e.g.*, *In re Millard, et al.*, No. 13-

---

[8]    The Debtor's insurance policies appear to be governed by the law of the Cayman Islands.

11625 (REG) (S.D.N.Y. Nov. 4, 2014) [Docket No. 27] (recognizing as a foreign main proceeding a proceeding conducted under the Bankruptcy Law); *In re The International Banking Corp.*, 09-17318 (SMB) (Bankr. S.D.N.Y. Jan. 15, 2010) (recognizing an administration under the Bahrain Central Banking Law as a foreign main proceeding).

> ii.      The Foreign Proceeding is a "foreign main proceeding"

44.      In addition to qualifying as a "foreign proceeding" under section 101(23), the Foreign Proceeding qualifies as a "foreign main proceeding."  *See* 11 U.S.C. § 1502(4).  Section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of main interests ("COMI") as of the date of the petition for recognition.  *See*, *e.g.*, *In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013) (affirming recognition of foreign main proceeding); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 705 (Bankr. S.D.N.Y. 2017) (recognizing foreign main proceeding). Absent evidence to the contrary, a debtor's registered office is presumed to be the COMI. 11 U.S.C. § 1516(c); *Fairfield Sentry*, 714 F.3d at 133, 137.

45.      Here, the Debtor's registered office and headquarters are in the Cayman Islands. Accordingly, it is entitled to the statutory presumption that the Cayman Islands is its COMI.  The legislative history makes clear, however, that this presumption is rebuttable and that the rule of the "registered office," *i.e.*, "place of incorporation," is "designed to make recognition as simple and expedient as possible" in cases where the facts are not controversial, rather than to establish a conclusive presumption.  H. REP. NO. 109-31, PT. 1, 109TH CONG., 1ST SESS. 112–13 (2005); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127–28 (Bankr. S.D.N.Y. 2007) [hereinafter *Bear Stearns I*].  Accordingly, where any "evidence to the contrary" is presented, the presumption does not govern.  *Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 595 (S.D.N.Y. 2012).

17

46.     Although neither the Bankruptcy Code nor the Model Law expressly defines COMI, courts have viewed COMI as a concept rooted in substance over form—the debtor's "real seat," as one court put it. *Bear Stearns I*, 374 B.R. at 130.  That Congress intended a substance-over-form consideration is evidenced by the minor weight afforded the presumption that COMI lies in the jurisdiction of formal registered office. *See, e.g., In re OAS S.A.*, 553 B.R. 83, 101–02 (Bankr. S.D.N.Y 2015) (rejecting argument that COMI lay in the debtor's letterbox jurisdiction because it had no assets, operations, employees, or other connections to its place of formal incorporation); *In re SPhinX, LTD*, 351 B.R. 103, 119 (Bankr. S.D.N.Y. 2006) (same); *Bear Stearns I*, 374 B.R. at 129 (same).  In short, a COMI analysis inquires as to the debtor's substantive "nerve center"—the center of its purpose, function, business activities, and strategic direction. This determination is made at the time that the Chapter 15 petition is filed. *Fairfield Sentry*, 714 F.3d at 138.

47.     This substantive inquiry is aided by a set of "factors" this court has developed and may consider when determining a debtor's COMI. These factors include:

> (1) The location of the debtor's headquarters;
>
> (2) The location of those who actually manage the debtor (which may be the headquarters of a holding company);
>
> (3) The location of the debtor's primary assets;
>
> (4) The location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case;
>
> (5) The jurisdiction whose law would apply to most disputes; and
>
> (6) The expectations of the third parties with regard to the location of a debtor's COMI.

*In re British Am. Isle of Venice*, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010) (citing *British Am. Ins. Co.*, 425 B.R. at 720); *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311 (GBD), 2011 U.S. Dist.

18

LEXIS 105770, at *10 (S.D.N.Y. Sep. 15, 2011) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd*, 389 B.R. 325, 336 (Bankr. S.D.N.Y. 2008)) [hereinafter *Bear Stearns II*]; *SPhinX, LTD*, 351 B.R. at 117.  Courts may consider some or all of these factors. *See British Am. Isle of Venice*, 411 B.R. at 720 ("These are not exclusive factors, nor must they all be met in each case"); *Fairfield Sentry,* 714 F.3d at 137 ("Consideration of these specific factors is neither required nor dispositive."); *In re Betcorp Ltd.*, 400 B.R. 266, 290 (Bankr. D. Nev. 2009) ("[C]ourts do not apply any rigid formula or consistently find one [COMI] factor dispositive; instead, courts analyze a variety of factors to discern, objectively, where a particular debtor has its principal place of business.").  This flexible, working definition respects that Congress, in declining to provide a definition "for a term that is not self-defining," left the text "open-ended, and invite[d] development by courts, depending on the facts presented, without prescription or limitation."  *Fairfield Sentry*, 714 F.3d at 138.  Accordingly, courts have tailored their COMI analyses varyingly across a wide range of facts and circumstances.

48.     Applying this required substantive analysis to the Debtor, it is clear that its COMI lies in the Cayman Islands. The Debtor is a Cayman-incorporated company with its registered office in the Cayman Islands, giving rise to the rebuttable presumption, correct in this instance, that the Debtor's COMI lies in the Cayman Islands.  The Debtor's headquarters is also located at a Cayman Islands address. The Debtor is regulated by CIMA. CIMA has now appointed, and the Cayman Court has now confirmed the powers of, the Joint Controllers, who are themselves resident in the Cayman Islands, to take control of the affairs of the Debtor and to carry on the business of the Debtor so far as may be necessary or expedient.

49.     The Insurance Manager is also based in the Cayman Islands and regulated by CIMA. The Insurance Manager acts as registered office and is the principal point of contact

between the Debtor and CIMA. It is the responsibility of the Insurance Manager to keep CIMA updated in relation to the Debtor, including but not limited to, timely submission of applicable documents, payment of license fees to CIMA, seeking CIMA approval for key changes to shareholders and directors or the business plan, informing CIMA of any legal or regulatory breaches whether in the Cayman Islands or abroad, notifying CIMA if there are difficulties in obtaining information from the Debtor, monitoring the capital and solvency positions to meet legal and regulatory requirements, and meeting with CIMA to provide assistance in respect of the Debtor.

50.     Thus as of the date of the Appointment Notice issued by CIMA on September 14, 2020, and more crucially for the purposes of this Court's analysis, the date hereof, the Cayman Islands is where the Debtor is managed, directed, and monitored as a strategic whole. The authority to make all major decisions has been granted to the Joint Controllers in consultation with and under the supervision of CIMA and the Cayman Court, including the power to take possession of the Debtor's property, to engage staff and to appoint counsel, attorneys and professional advisors. As noted in *Ascot Fund*, upon the authority of CIMA and the Cayman Court, it is now the office of the Joint Controllers that serves as the corporate nerve center from which its operations are coordinated and functionally located. *See In re Ascot Fund Ltd.*, 603 B.R. 271, 283 (Bankr. S.D.N.Y. 2019) (rejecting a focus on the company's activities prior to the filing of the Chapter 15 case and recognizing the Joint Controllers' control over a Cayman Islands exempted company).  It is thus abundantly clear that the Debtor has its COMI in the Cayman Islands.

51.     The Debtor's creditors are located across multiple jurisdictions such that the location of the Debtor's creditors cannot be marshalled to support a finding that its COMI is located anywhere other than the Cayman Islands.

52.    Another important factor in determining the COMI of a Debtor is the "expectations of its creditors." *In re Oi Brasil Cooperatief U.A.*, 578 B.R. 169, 225 (Bankr. S.D.N.Y. 2017); *see also Bear Stearns I*, 374 B.R. at 130 (holding that the debtors' COMI was "the place where the [debtors] conduct the administration of their interests on a regular basis and is therefore ascertainable by third parties"). The Debtor has taken action evincing a clear intention to create the expectation among its creditors that its relevant situs is in the Cayman Islands. It is headquartered in the Cayman Islands, a fact clearly displayed on its website, the "About Us" section of its website lists a Cayman Islands address for contact purposes, and its website further plainly states that the Debtor is both incorporated in the Cayman Islands, and subject to the strict regulatory environment thereof including regulation by CIMA. Furthermore, in at least one pending federal lawsuit of which the Joint Controllers are aware, the Debtor has contended that Cayman law and arbitration provisions apply to a health insurance policy that appears, upon belief, to be a form policy likely representative of such policies as a general matter.[9] Therefore, the evidence suggests that creditors would likely expect the Debtor's relevant situs to be in the Cayman Islands and the expectations of these creditors weigh heavily in favor of the Cayman Islands as the COMI of the Debtor.

53.    In conclusion, as the Debtor has been incorporated and is managed, and operating in the Cayman Islands, it maintains its COMI in the Cayman Islands.

### C.    The Joint Controllers Are Proper "Foreign Representatives"

54.    The second requirement for recognition of a foreign main proceeding under section 1517(a) of the Bankruptcy Code is that a foreign representative applying for recognition be a

---

[9] Pursuant to Fed. R. Evidence 201, the Court is requested to take judicial notice of the Motion to Dismiss, or in the Alternative to Stay, and to Compel Arbitration filed as docket entry #11 in that certain civil action pending in the United States District Court for the District of South Carolina as Case No. 2:20-cv-02879-MBS, a true and correct copy of which motion is attached hereto as Exhibit C.

person or body.  *See* 11 U.S.C. § 1517(a)(2).  Section 101(24) of the Bankruptcy Code further

explains that the "foreign representative is "a person or body . . . authorized in a foreign proceeding

to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a

representative of such foreign proceeding."  11 U.S.C. § 101(24).

55.     Here, each of the Joint Controllers is an individual, and therefore a "person" under

11 U.S.C. § 101(41). Furthermore, the Joint Controllers have been duly appointed by CIMA and

specifically authorized by the Cayman Court to commence proceedings under Chapter 15 of the

Bankruptcy Code on behalf of the Debtor to obtain recognition of the Foreign Proceeding. As such,

the Joint Controllers satisfy sections 101(24) and 1517(a)(2) of the Bankruptcy Code.

    **D.     The Petition Was Properly Filed under Sections 1504 and 1509 and Satisfied the Requirements of Section 1515**

56.     The third and final requirement for recognition of a foreign proceeding under

section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural

requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).  Here, all of

those procedural requirements are satisfied.

57.     First, the Joint Controllers duly and properly commenced this Chapter 15 Case in

accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing their petition with

all the documents and information required by sections 1515(b) and 1515(c).  *See Bear Stearns*,

374 B.R. at 127 ("A case under chapter 15 is commenced by a foreign representative filing a

petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code."),

*aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

58.     Second, in accordance with section 1515(b)(1)-(2) and (d) of the Bankruptcy Code,

the Joint Controllers have submitted evidence of the existence of the Foreign Proceeding and the

appointment of the Joint Controllers as foreign representative with respect thereto. *See* Voluntary

Petition [ECF No. 1].

59.      Finally, in accordance with section 1515(c) of the Bankruptcy Code, the Petition contains a statement identifying the Foreign Proceeding as the only foreign insolvency proceeding currently pending with respect to the Debtor.[10]

60.      For all of the reasons set forth above, the Joint Controllers respectfully submit that all of the requirements of section 1517(a) have been satisfied and that the Debtor is entitled to all of the relief provided under section 1520 of the Bankruptcy Code.[11]  Thus, the Joint Controllers respectfully ask that the Court enter the Proposed Order attached hereto as <u>Exhibit A</u> recognizing the Foreign Proceeding as a foreign main proceeding with respect to the Debtor.

**E.      In the Alternative, the Foreign Proceeding is a Foreign Nonmain Proceeding**

61.      In the unlikely event that the Court concludes that the Debtor's COMI is not in the Cayman Islands and that the Foreign Proceeding is not a "foreign main proceeding," the Court should recognize the Foreign Proceeding as a "foreign nonmain proceeding" as that term is defined in section 1502(5) of the Bankruptcy Code.  Section 1517(b)(2) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign nonmain proceeding" if it is pending in the country where the debtor has an establishment as of the date of the filing of the petition for recognition.  *See* 11 U.S.C. §1502(5); *In re British Am. Ins. Co.*, 425 B.R. at 915 ("Whether the debtor has an 'establishment' in a country must be determined at the time of the filing of the chapter 15 petition"); *see also Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) ("the relevant time period to determine whether Ran has an establishment in Israel is at the time Lavie filed his

---

[10]    This statement is also set forth in the Debtors' Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(A)(4) and 7007.1 filed contemporaneously herewith.

[11]    Upon recognition of the Foreign Proceeding as a foreign main proceeding, certain relief is automatically granted as a matter of right.  *See* 11 U.S.C. § 1520.

petition for recognition").

62.     Section 1502(2) of the Bankruptcy Code defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). This has been described as a "'local place of business,'" which should constitute a "'seat for local business activity' of the debtor." *In re British Am. Ins. Co.*, 425 B.R. at 914-15 (citing *Bear Stearns I*, 374 B.R. at 131).  A showing that a debtor has an establishment in a certain country will require a "showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property." *See Id*.  This requires that the debtor conduct market-facing activities in the country. *See In re Mood Media Corp.*, 569 B.R. 556, 562.  As the Debtor is registered and headquartered in the Cayman Islands, and since September 14, 2020 the authority to make all major decisions has been granted to the Joint Controllers, who are resident in the Cayman Islands, including the power to take possession of the Debtor's property, to engage staff and to appoint counsel, attorneys and professional advisors, there can be little doubt the Debtor carried out nontransitory economic activity there.

63.     Therefore, as of the date of the filing of the Chapter 15 case, the Debtor has an establishment in the Cayman Islands as required under section 1517(b)(2) of the Bankruptcy Code.

64.     For the reasons set forth above, the Foreign Proceeding is a "foreign proceeding" for the purposes of Chapter 15 of the Bankruptcy Code, the Joint Controllers are a proper "foreign representative" and the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code.

**F.     The Petitioners' Request Necessary and Appropriate Relief under Section 1521(a)**

65.     Pursuant to section 1521(a) of the Bankruptcy Code, the Petitioners request that this Court enter an order granting certain additional relief generally described above, with

reservation of the right to seek such further relief and additional assistance under sections 1521 and 1507. Upon recognition of the Foreign Proceeding, this Court may grant "any appropriate relief" under section 1521(a) of the Bankruptcy Code where necessary to effectuate Chapter 15's purpose and protect the Debtor's assets or the interests of its creditors. The additional relief requested is "appropriate" because it is necessary to ensure the Foreign Proceeding's success.

66.    Pursuant to section 1522(a) of the Bankruptcy Code, this Court may only grant additional relief under section 1521(a) of the Bankruptcy Code if creditor interests are "sufficiently protected." Legislative history indicates this limitation was meant to apply where "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." See H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005). A determination of sufficient protection requires a balancing of the respective parties' interests. See, e.g., *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012)); *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012).

67.    Here, creditors are "sufficiently protected" by the treatment afforded them by the Foreign Proceeding.  Among other things, judicial oversight by the Cayman Court of the powers of the Joint Controllers is available to CIMA and creditors and policyholders of the Debtor.  *See* Cayman Order ¶ 8 ("[t]he Joint Controllers, [CIMA], and creditors and policyholders of the Company shall have liberty to apply"). Moreover, the relief requested under section 1521(a) of the Bankruptcy Code is necessary to ensure the Foreign Proceeding's success, as noted above.

## CONCLUSION

WHEREFORE, the Joint Controllers respectfully request that the Court: (a) enter the Proposed Order, upon notice and a hearing, substantially in the form attached hereto as Exhibit A,

and (b) grant such other and further relief as may be just and proper.

Dated September 22, 2020                           Respectfully submitted,

                                                   BAKER & MCKENZIE LLP

                                                   By: /s/ Mark D. Bloom
                                                   Mark D. Bloom
                                                   FL Bar No. 303836
                                                   Mark.Bloom@bakermckenzie.com
                                                   John R. Dodd
                                                   FL Bar No. 38091
                                                   John.Dodd@bakermckenzie.com
                                                   Isabella de la Guardia
                                                   FL Bar No. 119843
                                                   Isabella.delaGuardia@bakermckenzie.com
                                                   1111 Brickell Avenue
                                                   Suite 1700
                                                   Miami, Florida 33131
                                                   Telephone: (305) 789-8900
                                                   Facsimile: (305) 789-8953

                                                   *Attorneys for the Joint Controllers and*
                                                   *and Foreign Representatives*

**VERIFICATION OF CHAPTER 15 PETITION**

Pursuant to 28 U S.C § 1746, I, Jeffrey Stower, declare as follows:

I am Jeffrey Stower a Director of KPMG's Restructuring Practice in the Cayman Islands and one of two authorized foreign representatives of the Debtor with respect to the Foreign Proceeding. I have received the factual contents of the foregoing Verified Petition, including each of the attachments and appendices thereto from the Debtor and their legal counsels, and based on (a) my personal knowledge, (b) my review of certain documents, and (c) my review of publicly available information, I am informed and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 22, 2020                     Respectfully submitted

                                              _____
                                              Jeffrey Stower

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re: | Chapter 15 |
| | Case No. _____-___ |
| Premier Assurance Group SPC Ltd., | |
| | |
| Debtor in a Foreign Proceeding. | |

**ORDER GRANTING RECOGNITION OF FOREIGN MAIN**
**PROCEEDING AND CERTAIN RELATED RELIEF**

Upon the *Verified Petition for Recognition of the Foreign Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 1515, 1517, 1520 and 1521* dated September 22, 2020 [ECF No.___] (the "Motion") filed by Jeffrey Stower and Jason Robinson, in their capacity as the authorized Foreign Representatives (the "Joint Controllers" or the "Foreign Representative") of Premier Assurance Group SPC Ltd. (the "Debtor"), in the above-captioned chapter 15 case (the "Chapter 15 Case"), requesting this Order (the "Order") (a) granting the form of voluntary petition [ECF No. 1] and the Motion (together, the "Petition") and recognizing the

controllership of the Debtor (the "<u>Foreign Proceeding</u>") pending before the Grand Court of the Cayman Islands pursuant to the Cayman Islands Insurance Law (the "<u>Cayman Insurance Law</u>") of the laws of the Cayman Islands ("<u>Cayman Islands</u>") as a foreign main proceeding or, in the alternative, as a foreign nonmain proceeding with respect to the Debtor pursuant to section 1517 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (b) recognizing the Joint Controllers as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code, the Debtor with respect to the Foreign Proceeding, (c) granting additional relief under section 1521 of the Bankruptcy Code, and (d) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Motion pursuant to sections 157 and 1334 of title 28 of the United States Code; and this Court having reviewed the Petition, and having heard the statements of counsel with respect to the Petition at a hearing before this Court (the "<u>Hearing</u>"); and appropriate and timely notice of the filing of the Petition and the Hearing having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Petition and all other pleadings and papers in this case establish just cause to grant the relief ordered herein, and after notice and a hearing and due deliberation therefor;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

      A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code.  This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.  Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

C.      The Joint Controllers are the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

D.      This Chapter 15 Case was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E.      The Joint Controllers have satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 2002(q).

F.      The Foreign Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

G.      The Foreign Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

H.      The COMI of the Debtor is in the Cayman Islands. Accordingly, the Foreign Proceeding is a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code, with respect to the Debtor, and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.  | The Debtor has an establishment in the Cayman Islands.  Accordingly, the Foreign Proceeding is a "foreign nonmain proceeding," as defined in section 1502(5) of the Bankruptcy Code, with respect to the Debtor, and is entitled to recognition as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Bankruptcy Code.

I.      The relief requested by the Foreign Representatives under section 1521 of the Bankruptcy Code is appropriate, and the Foreign Representatives are entitled to the additional

relief requested under section 1521 of the Bankruptcy Code.

J.      The relief sought by the Motion will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Joint Controllers and the Debtor.  The interests of the Debtor, creditors of the Debtor and other interested entities are sufficiently protected.

K.      The relief granted hereby is necessary and appropriate to effectuate the purposes and objectives of chapter 15 and to protect the Debtor, its creditors and other parties in interest.

L.      Appropriate notice of the filing of and the hearing on the Petition and the Motion was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

M.      The relief granted hereby is necessary and appropriate in the interests of the public and international comity; it is consistent with the public policy of the United States; it is warranted pursuant to sections 1515, 1517, 1520 and 1521 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated by the Court at the hearing and reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Petition is granted.

2.      The Joint Controllers are the duly appointed foreign representative of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and are authorized to act on behalf of the Debtor in this Chapter 15 Case.

3.      The Foreign Proceeding is granted recognition as a foreign main proceeding |

foreign nonmain proceeding pursuant to section 1517 of the Bankruptcy Code with respect to the Debtor.

4.    [All relief and protection afforded foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Foreign Proceeding, the Debtor, the Debtor's assets located in the United States, and the Joint Controllers, as applicable.]

5.    A stay of the commencement or continuation of any individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities to the extent not otherwise stayed under section 1520 is hereby granted under section 1521(a)(1) of the Bankruptcy Code.

6.    A stay of execution against the Debtor's assets to the extent not otherwise stayed under section 1520 is hereby granted under section 1521(a)(2) of the Bankruptcy Code.

7.    Under section 1521(a)(3) of the Bankruptcy Code, the right to transfer, encumber or otherwise dispose of any assets of the Debtor without the consent of the Foreign Representatives is hereby suspended to the extent not otherwise suspended under section 1520.

8.    Under section 1521(a)(4) of the Bankruptcy Code, the Foreign Representatives are hereby granted the right to examine witnesses, take evidence and take delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

9.    Under section 1521(a)(5) of the Bankruptcy Code, the Joint Controllers are hereby entrusted with the administration and realization of all of the Debtor's assets within the territorial jurisdiction of the United States.

10.    Under section 1521(a)(6) of the Bankruptcy Code, provisional relief previously granted pursuant to that certain Emergency Motion for Entry of an Order Granting Provisional Relief Entrusting the Administration and Realization of Debtor's Assets to the Foreign Representative dated September 22, 2020 [ECF No.___] is hereby extended and made final.

11.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Joint Controllers are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Joint Controllers are authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

12.     This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order and any requests for additional relief or any adversary proceeding brought in and through this case.

###

**Submitted by:**
Mark Bloom, Esq.
FL Bar No. 303836
Mark.Bloom@bakermckenzie.com
BAKER & MCKENZIE LLP
1111 Brickell Avenue
Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900

*Attorneys for the Joint Controllers and Foreign Representatives*

Mark Bloom shall serve a copy of the signed order on all interested parties and file with the court a certificate of service conforming with Local Rule 2002-1(F).

**EXHIBIT B**

**Roe Affidavit**

(*See attached*)

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. FSD:        OF 2020 [       ]

IN THE MATTER OF THE INSURANCE LAW, 2010
AND IN THE MATTER OF PREMIER ASSURANCE GROUP SPC LTD.  (IN CONTROLLERSHIP)

---

### FIRST AFFIDAVIT OF AUDREY ROE

---

I, **Ms**. **Audrey Roe** of the Cayman Islands Monetary Authority, SIX, Cricket Square, Shedden Road, George Town, P.O. Box 10052, Grand Cayman, KY1-1001, Cayman Islands **MAKE OATH AND SAY** as follows:

1.    I am currently employed as the Head of the Compliance Division of the Cayman Islands Monetary Authority ("the Authority") at the above address.

2.    I have been concerned in and have personal knowledge of the matters giving rise to this application by the Joint Controllers and the appointment of Mr. Jeffrey Stower and Mr. Jason Robinson of KPMG Cayman Islands as the Joint Controllers ("Joint Controllers") of Premier Assurance Group SPC Ltd. ("PAG" or the "Licensee") **[Exhibit AR-1, 1]**. In addition, I am duly authorised by the Managing Director of the Authority to make this affidavit in support of the Joint Controllers' petition dated 17 September 2020 (the "Petition").

3.    The facts and matters deposed to in this affidavit, which are within my own personal knowledge, are true and correct to the best of my information and belief. Where the contents of this affidavit are not within my own personal knowledge, I have stated the source of my knowledge and confirm that these are also true and correct to the best of my information and belief.

4.    The facts and matters deposed in this affidavit are derived either from:
      (a)    The documents, information and communications from and with various service providers of PAG;

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

(b)  The information in the Monetary Authority's Records Systems ("MARS") or hard copy files to which I have access, and which reflects information collected by the Insurance Supervision Division ("INS") of the Authority. The INS Division has responsibility for supervising entities conducting business in accordance with the Insurance Law, 2010 (the "IL"); and

(c)  Other information obtained by the Compliance and Insurance Divisions.

5.  There is now produced and shown to me marked "AR-1" a bundle of copy documents to which I refer. Unless otherwise stated, references in this affidavit to pages are to those in AR-1. Redactions may have been made to the exhibit to preserve confidential, commercially sensitive or privileged information.

**Introduction**

6.  The Authority has sufficient evidence to support its very real and legitimate concerns that based upon the evidence and previous conduct of the directors of PAG (as outlined below) that once the Joint Controllers' appointments are made known to them they may seek to dissipate its assets, resulting in the policy holders and creditors suffering severe losses and the Joint Controllers and the Authority being hampered in effectively supervising and regulating the Licensee.

7.  There is sufficient evidence within this affidavit and exhibits to show the previous SEC investigation and Order **[AR-1, 6-14]** uncovered that two of the directors were effectively using PAG as a *piggy bank* and were loaning themselves money from its assets, whilst serving as investment managers of PAG. The Auditors also have strong evidence that a number of receivables on PAGs financial statements are now not recoverable and that this activity is the modus operandi of the directors rather than a one-off event.

8.  A parallel corporate structure in another jurisdiction may already have been put in place to receive the assets of PAG should they need to be moved quickly.

**Background**

23474055.1 K1391.166751

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

9.  PAG was incorporated as an Exempted Segregated Portfolio Company on 29 June 2012 and issued an unrestricted Class B Insurer's Licence by the Authority on 4 July 2012, pursuant to section 4(3)(iii) of the then Insurance Law (2008 Revision). The ultimate parent of the Licensee is Beast Capital LLC. ("Beast").

10. Based on information available to the Authority the current directors of PAG are Jorge Eduardo Falcon ("Mr. Falcon"), Leonardo Cornide ("Mr. Cornide"), Luis J. Lauredo and Alcides Isidoro Avila. Mr. Cornide and Mr. Falcon, as the founding directors and shareholders (the "Founders"). The Founders each hold 50% beneficial interest in PAG through Beast.

11. At the time of licensing, the auditor of PAG was BDO Cayman Ltd. ("BDO") whilst Captiva Managers (Cayman) Ltd. ("Captiva") was the insurance manager. BDO and Captiva have now ceased providing services to PAG as of the 30 September 2019 and 1 November 2019 respectively. Lainston International Management, Ltd. ("Lainston") have been subsequently appointed insurance manager of the Licensee on 1 November 2019 whilst RSM (Cayman) Ltd. ("the Auditors") was appointed on 9 January 2020.

12. PAG is a segregated portfolio company consisting of a *core* with two segregated portfolios, namely, Premier Assurance Segregated Portfolio ("PASP") (formerly WEA International Trust) and Global Assurance Segregated Portfolio ("GASP") which were both formed on 13 September 2012. PASP offers unit-linked life insurance products through Premier Trust which is registered in the British Virgin Islands ("BVI") while GASP underwrites health insurance products through PA Global Trust, which is also registered in the Cayman Islands. The insurance products of these segregated portfolios are offered globally but are not sold to citizens or residents of the United States of America or the Cayman Islands. 70% of PAG's business by volume is generated from Latin America, with the balance being generated from the Caribbean (other than the Cayman Islands), Europe and Asia.

13. PAG operates a licensed branch in Labuan, Malaysia. The consent of the Authority to open a foreign branch was sought and granted on 20 November 2014.

**SEC Investigations into Mr Cornide and Mr Falcon**

14. In the last quarter of 2019, I became aware that on the 25 September 2019 the United States Securities and Exchange Commission ("SEC') had settled cease-and-desist proceedings against Mr. Cornide and

3

23474055.1 K1391.166751

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

Mr. Falcon for using investment funds to obtain personal loans and for failing to disclose their personal interest in transactions in which they used additional investment funds. The Authority were not informed of this SEC investigation or settlement by Mr Cornide or Mr Falcon as directors of PAG, until 25 June 2019, when Mr. Falcon and Mr. Cornide responded directly to the Authority's question to Captiva seeking to establish if the directors or PAG were subject to any type of investigation by any regulatory bodies. On 25 June 2019, via e-mail **[AR1, 2-5]** the Founders responded advising, *"Premier Assurance Group, LLC, a Miami-based Florida limited liability company ("PAG"), a private company of which I am half owner, has been the subject of an investigation by the U.S. Securities and Exchange Commission ("SEC"), since approximately August 2017. An outline of a mutually-agreeable settlement with the SEC has been reached, but the details and language of the settlement are still being negotiated. PAG's legal counsel informs me that the matter is expected to conclude during the summer of 2019."*

15. Both Mr. Falcon and Mr. Cornide misrepresented the nature of the investigation to the Authority in that they failed to disclose to the Authority that they were personally subject to an SEC investigation together with their colleagues at PAG who were also interviewed by the SEC. The eventual findings made by the SEC were against the Founders in their individual capacities and not against Premier Assurance Group, LLC as suggested in their responses **[AR1, 6-14].**

16. The SEC's order **[AR1, 6-14]** stated that Mr. Cornide and Mr. Falcon, who also acted as investment advisers to PAG, advised PAG to invest up to 25% of its investment reserves in a note with Silverback Capital Partners, LLC (Silverback), an entity which is also owned and controlled by Mr. Cornide and Mr. Falcon. Silverback would then make personal loans back to Mr. Cornide and Mr. Falcon totalling over US$7 million from the funds borrowed from PAG.

17. Additionally, the order stated that as Mr. Cornide and Mr. Falcon owned PAG's holding company and Silverback, and also provided investment advice to PAG, there was a clear conflict of interest, breach of their fiduciary duty to their client and a failure in their duty to disclose all material conflicts, whenever they recommended that PAG invest in the note with Silverback **[AR1, 1-9]**.

18. The SEC's order found that Mr. Cornide and Mr. Falcon violated Section 206(2) of the Investment Advisers Act of 1940 and without admitting or denying the SEC's findings, the Founders consented to a cease-and-desist order and agreed to pay collective disgorgement and interest of over US$7 million and a civil penalty of US$100,000 each **[AR1, 9 & 12]**.

4

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

*Events Prior to the Appointment of the Controllers*

### *GASP*

19. The segregated portfolio of GASP has a protracted history of balance sheet insolvency which prompted the Authority to impose a requirement on PAG to file quarterly management accounts as part of enhanced regulatory supervision in 2016.

20. Following the above, on 10 April 2019, the Authority directed PAG to; (i) Cease-and-Desist from writing new business attributable to GASP; (ii) inject sufficient new capital into GASP to establish and maintain the required level of solvency of GASP by 7 May 2019. In addition, the Authority cautioned PAG and its directors that a failure to comply with the above directions could result in the Authority taking enforcement action against the Company and its Directors **[AR1, 16-17]**.

21. On 3 May 2019, Captiva (the then Insurance Manager) e-mailed the Authority a letter from the directors of PAG, in which they advised that PAG would inject capital of $1,000,000 into GASP in order to make it solvent and would do so by the end of the following week, which would have been the 12 May 2019 **[AR1, 17-20]**. PAG did not ever inject the $1,000,000 of capital into GASP and the directors did not ever confirm to the Authority either directly or through their Insurance Manager that they had done so.

22. The Authority was informed by the Auditors that they had a number of conerns regarding the solvency and financial arrangements of PAG, following the 2019 audit. The Auditors were specifically concerned about the following:

    (1) GASP had violated the Cease-and-Desist order imposed by the Authority on 10 April 2019 by writing new business in 2020 **[ AR1 , 16-17]**.

    (2) Following a conference call with the directors on the 28 July 2020, the Auditors were informed that certain entries in the 2019 financial statements had been incorrectly attributed to GASP.

    (3) PAG had established a 'rent a cell' arrangement in another jurisdiction from where it is now writing its health insurance book of business.

    (4) It is PAG's intention to establish another Segregated Portfolio type structure in the same jurisdiction as the current rent-a-cell arrangement.

5

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

(5) PAG eventually transferring GASP's entire book of business to the new SP structure in the jurisdiction referred to above in 22 (3) and (4).

23.    On 3 August 2020, the Authority received the audited financial statements of GASP from the Auditors for the financial year ending 31 December 2019 ("FYE 2019"). According to the financial statements, GASP had a capital deficit of US$9,808,265 as at 31 December 2019. PAG's own management accounts showed that the deficit had increased to US$15,025,789 as at 31 March 2020. The Auditor's and PAG's records both attest to GASP's increasing insolvency. **[AR1, 23]**.

24.    The financial statements of GASP were prepared on the going concern basis of accounting as the directors were satisfied that GASP had the resources to continue in business for the foreseeable future. The Auditors observed under heading "*Basis for Adverse Opinion*" that GASP was not a going concern. **[AR-1, 22]**.

25.    On 31 August 2020 in a new business plan submitted to the Authority, PAG proposed to terminate GASP **[AR-1, 47-96]**.

26.    The Authority has received a number of complaints by GASP's policy holders over the delayed settlement of claims, which have included allegations of fraud and refusal to return calls or emails against PAG.

**PASP**

27.  On 3 August 2020, the Authority received PASP's audited financial statements for FYE 2019 which were prepared by the Auditors. The financial statements depicted PASP as solvent with shareholder equity of US$14,150,462 **[AR-1, 102]**. The financial statements did however contain a "*Disclaimer of Opinion*" in which the Auditors stated that they had not obtained sufficient appropriate audit evidence to provide the basis for an audit opinion on the financial statements. The basis for the *Disclaimer of Opinion* **[ AR-1, 99]** were stated as:

(1)  The adverse economic impact of COVID-19 being included in the projection of loss reserves in the financial statements;

(2)  PASP using an unapproved Discounted Cash Flow ("DCF") methodology to formulate its loss reserves.

6

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

28. With respect to the adverse economic impact of COVID-19 being included in the projection of the loss reserves, the Auditors stated that COVID-19 was a non-adjusting post balance sheet event that did not exist on 31 December 2019, the financial year-end date, and that modelling COVID-19 into the formulation of loss reserves resulted in loss reserves and total liabilities being understated by US$18,286,190. (An adjustment of Total Liabilities by this amount would leave PASP with a capital deficit of US$4,135,728 on the balance sheet date) **[ AR-1, 99]**.

29. The Auditors went on to advise that PASP had used an unapproved Discounted Cash Flow ("DCF") methodology to formulate its loss reserves. Had PASP used the approved Cash Value methodology, its loss reserves would have been substantially higher **[ AR-1, 121]**. The Auditors further advised the Authority that the DCF understated PASPs loss reserves and total liabilities by US$16.7M.

30. Additionally, the Auditors included an "*Emphasis of Matters*" paragraph within PASP's audited financial statements **[ AR-1, 100]** in which they highlighted *inter alia,* the following:

    (1) The existence of a receivable asset of US$6,672,665 on the balance sheet which was due from PASP's affiliates. PASP however were unable to obtain or provide sufficient assurances regarding the recoverability of these receivable assets;

    (2) The existence of a receivable asset of US$3,350,244 on the balance sheet which was due from PASP's reinsurers. PASP however again were unable to provide sufficient assurances regarding the recoverability of recoverability these receivable assets.

31. The Auditors further informed the Authority that the shareholders of PAG were selling PASP and had invited expressions of interest which closed on 24 July 2020. The Auditors could not shed further light on the transaction as they were not intimately involved in the planned disposal of PASP. The Authority have not been informed of the planned disposal of PASP.

32. Lastly the Auditors advised the Authority that PAG had explicitly expressed to them, a desire to redomicile from the Cayman Islands and held a real fear that "they [PAG and their directors] will just walk away" leaving policy holders at risk.

7

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

33. In conclusion and perhaps of greatest concern was the warning to the Authority that in the Auditor's view, *"Premier, as an entity could implode and CIMA need to think how they deal with the Company in the short to medium term. One option would be to immediately close the Company down and place it into liquidation."*

34. The financial statements of PAG, GASP and PASP received in 2020 and the Auditor's observations, evidence, statements and comments were all of grave concern to the Authority. Taken together these items reveal that the directors and PAG are:

    (i)  manipulating financial statements by understating reserves and overstating assets;

    (ii) operating an insolvent segregated portfolio (GASP) which is struggling to pay its claims;

    (iii) in the process of relocating the book of business currently written by GASP to another jurisdiction;

    (iv) in the process of selling PASP without informing the Authority;

    (v) in breach of the Authoirty's Cease and Desist Order;

    (vi) in breach of the IL.

35. As a result of the above, when taken in conjunction with the misrepresentations made to the Authority and the facts uncovered by the SEC investigation, the integrity of the directors is severely undermined. It also appears that the directors are preparing to dissipate the remaining assets of PAG, causing serious harm to the policy holders and creditors.

**The Appointment of Controllers over PAG**

36. Following the above, the Authority resolved and then appointed Controllers on 14 September 2020 using our statutory powers, under the IL. **[ AR-1, 1 & 130-131]**

37. The Authority has sufficient evidence to support its real and legitimate concerns that based upon the evidence and conduct of the directors as outlined above that once the Joint Controllers' appointment is made known to the directors they may well seek to dissipate the assets of PAG resulting in the policy holders and creditors suffering severe losses.

38. The below is a table summarising the financial position of PAG as of the 31 March 2020:

8

23474055.1 K1391.166751

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

| Assets | Core | PASP | GASP | TOTAL |
|---|---|---|---|---|
| Cash and Cash equivalents | $19,458 | $8,148,276 | $417,704 | $8,585,438 |
| Interest Receivable | 0 | 1,420,450 | (22,798) | 1,397,652 |
| Reinsurance Recoverable | 0 | 3,380,244 | 711,000 | 4,091,244 |
| Premiums Receivable | 0 | 1,780,303 | 10,118,338 | 11,898,641 |
| Due (To) From Affiliates | 44,246 | 10,759,835 | (5,255,675) | 5,548,406 |
| Prepaid Expenses | 0 | 1,049,697 | 6,897,987 | 7,947,684 |
| Investments | 775,871 | 94,754,216 | 4,691 | 95,534,778 |
| Property, Equipment and Software | 0 | 2,264,643 | | 3,714,643 |
| Accumulated Depreciation | 0 | 975,000 | | (1,792,511) |
| Total Assets | $839,575 | $122,582,665 | $13,503,737 | $136,925,976 |

39. There is sufficient evidence before the Authority to support that:

    (1) PAG are / or appear likely to become unable to meet their obligations as they fall due;

    (2) PAG are carrying on business in a manner detrimental to the public interest and to the interest of its creditors and policy holders;

    (3) PAG have contravened the Insurance Law;

    (4) The direction and management of the PAG's business has not been conducted in a fit and proper manner; and in relation to the directors;

    (5) PAG's assets have already been diverted from PAG to questionable investments (including Silverback) and continue to invest in instruments that have serious recoverability concerns;

    (6) The Auditor's opinion that PAG are seeking to leave the jurisdiction imminently, perhaps evade regulation and are in the process of setting up an alternative structure to house PAG's assets;

9

23474055.1 K1391.166751

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

(7)  Jorge Eduardo Falcon and Leonardo Cornide are not fit and proper persons to hold the position of director of a licensee.

40.  It is my understanding and I have been advised that the Joint Controllers have sufficient statutory powers in order to carry out their duties; however they do require the assistance of this Honourable Court in granting the Joint Controllers' application such that they may take all of the necessary steps in the United States in order to administer the affairs of PAG, protect the dissipation of assets and the policyholders and creditors. There is a very real and legitimate concern based on the conduct outlined above that once the Joint Controllers' appointment is made known to the directors, they may well dissipate the assets of PAG. The proposed order will allow the Joint Controllers to be more effective in:

(a)  assuming control of, collecting and getting all property or assets of whatever nature to which, the Licensee is or appears to be entitled;

(b)  safeguarding the interests of investors or creditors and to provide an inventory of assets and liabilities as necessary;

(c)  taking possession or making copies of the books, records and other documents pertaining to the affairs of the Licensee to enable a proper accounting of the current financial position of the Licensee;

(d)  preparing and furnishing an interim and final report in accordance with the Authority's instructions as specifically addressing the financial position of the Licensee and the state of its books and records.

41.  The Authority as the regulator of financial services in or from within the Cayman Islands has an overarching regulatory function and as such is required under the Monetary Authority Law to carry out its stated regulatory functions. These regulatory functions include, but are not limited to, endeavouring to promote and enhance market confidence, consumer protection and the reputation of the Islands as a financial centre; and endeavouring to reduce the possibility of financial services business or relevant financial business being used for the purpose of money laundering or other crime.

42.  There is now produced and shown to me an exhibit marked **"AR-1"** containing a true copy of the Joint Controllers' application by way of Petition dated 17 September 2020, seeking confirmation of the Joint

10

23474055.1 K1391.166751

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant
A. Roe
First affidavit
17th day of September 2020
Exhibits AR-1

Controllers' powers under section 24(2)(h) of the IL. I have read the Petition and confirm that the Authority supports the relief sought in the Petition.

43. Having regard to the foregoing and for the reasons set out in above, the Authority supports the Joint Controllers' application and the proposed order so that the Authority may carry out its stated statutory functions as outlined above and maintain the status of the islands as a reputable financial centre.

| | |
|---|---|
| SWORN to at George Town, Grand Cayman ) | |
| this 17th day of September 2020 ) | |
| before me ) | Audrey Roe |
| Notary Public | |

Angelina Partridge
Notary Public for and in
The Cayman Islands
Commission expires 31 January 21

23474055.1 K1391.166751

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

Filed on behalf of the Applicant<br>
A. Roe<br>
First affidavit<br>
17th day of September 2020<br>
Exhibits AR-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD:**    **OF 2020 [**    **]**

**IN THE MATTER OF THE INSURANCE LAW, 2010**

**AND IN THE MATTER OF PREMIER ASSURANCE GROUP SPC. LTD.  (IN CONTROLLERSHIP)**

---

**EXHIBIT AR-1**

---

This is the Exhibit marked AR-1 referred to in the First Affidavit of Audrey Roe sworn before me on this 17 day of September 2020.


_____

Notary Public

Angelina Partridge
Notary Public for and in
The Cayman Islands
Commission expires 31 January 21

23474055.1 K1391.166751

This Affidavit was filed by the Cayman Islands Monetary Authority, on behalf of the Controllers, whose address for service is KPMG, SIX Cricket Square, Grand Cayman, the Cayman Islands, KY1-1001.

**EXHIBIT C**

**Motion to Dismiss, or in the Alternative to Stay, and to Compel Arbitration**

(*See attached*)

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Doyle J. Dreesen, | C/A#:  2:20-cv-02879-MBS |
| Plaintiff, | |
| vs. | **MOTION TO DISMISS,**<br>**OR IN THE ALTERNATIVE TO STAY,**<br>**AND TO COMPEL ARBITRATION** |
| Premier Assurance Group, SPC, Ltd., | |
| Defendant. | |

Defendant Premier Assurance Group, SPC, Ltd., (hereinafter "Defendant" or "Premier"),
by and through its undersigned attorneys, in response to Plaintiff's Amended Complaint, hereby
moves this Court pursuant to Rules 12(b)(1), (3), and (6) of the Federal Rules of Civil Procedure,
the South Carolina Uniform Arbitration Act, S.C. Code § 15-48-10 *et seq.,* and 9 U.S.C. §1, et
seq., of the Federal Arbitration Act, for an order dismissing the claims asserted in this action, or
in the alternative staying proceedings, and compelling all claims to arbitration due to a
conspicuous arbitration provision between the parties in this case.[1]  In support of this Motion,
Defendant relies upon the arguments contained in its Memorandum of Law filed in conjunction
with this Motion and respectfully shows the Court as follows:

1.  Plaintiff's Amended Complaint alleges that Plaintiff Doyle J. Dreesen (hereinafter
    "Plaintiff") and Defendant entered into a binding contract (hereinafter "the Policy" or

---

[1] Defendant files this Motion to Dismiss in lieu of filing an Answer at this stage. *See e.g.,* Rule
12(b), FRCP ("A motion asserting any of these defenses must be made before pleading if a
responsive pleading is allowed.").  To the extent an Answer is required at this stage, Defendant
denies all allegations contained and relief sought against him in Plaintiff's Amended Complaint
and demands strict proof thereof.

"the Contract") whereby Plaintiff agreed to pay a premium in exchange for health insurance benefits.  (*See* Complaint at ¶ 3).

2.  A copy of the applicable Conditions of Coverage for the Policy between Plaintiff and Defendant is attached as "Exhibit A" to this Motion.

3.  Section 2 - "Terms and Conditions" - of the Conditions of Coverage for the Policy contains the following conspicuous Arbitration Provision:

ARBITRATION

All disputes arising out of or relating to this Policy, or any matter that is related directly or indirectly to this insurance, which cannot first be resolved by the parties through settlement negotiations for a period of sixty (60) days, shall be resolved exclusively through binding, Non -appealable and confidential private arbitration. The arbitration shall be administered based on the arbitration laws of the Cayman Islands.

(Exhibit A at 4).

4.  Section 2 of the Conditions of Coverage for this Policy also contains the following conspicuous Jurisdiction/Applicable Law Provision:

JURISDICTION / APPLICABLE LAW

This policy is governed by, and shall be construed in accordance with the laws of the Cayman Islands and shall be subject to its exclusive jurisdiction.

This Policy may not comply with laws, regulations or mandatory coverages as required by the laws of the Policyholder's Home Country, the United States or any other jurisdiction.

(Exhibit A at 4).

5.  Despite the presence of the aforementioned Arbitration and Jurisdiction/Applicable Law Provisions in the Policy, Plaintiff initially instituted this lawsuit in the Court of Common Pleas of Charleston County, South Carolina asserting claims encompassed by the provision. (*See* ECF No. 1). Defendant immediately removed this action to the United State District Court for the District of South Carolina, Charleston Division pursuant to 28

U.S.C. § 1332 and § 1441 because there is complete diversity of citizenship among all of the parties (and prospective substituted parties), and the amount in controversy in this civil action, exclusive of interest and costs, exceeds the sum of $75,000.00.

6. Because each and every claim pled in the Amended Complaint seeks relief based upon the subject matter of the Policy, each and every claim pled in the Complaint is subject to the Arbitration Provision and the Jurisdiction/Applicable Law Provision of the Policy. Subject to these Provisions, this matter must be compelled to arbitration in the exclusive jurisdiction of the Cayman Islands and interpreted solely under the laws of the Cayman Islands.

7. At the very least, all of the claims alleged in the Complaint meet the Fourth Circuit's liberal standard for arbitrability, because all claims bear a "significant relationship" to the Agreement and its "broadly-worded" Arbitration Provision.[2]

8. Therefore, assuming *arguendo* that the allegations in Plaintiff's Amended Complaint are true: (1) a Contract exists and is valid between the parties; (2) the Terms and Conditions of the Contract, made an exhibit to the Amended Complaint, contain conspicuous, broadly-worded Arbitration and Jurisdiction/Applicable Law Provisions; and (3) all of the claims in the Amended Complaint arise out of the subject matter of the Contract and/or bear a significant relationship to the Contract.

9. There is no genuine issue as to any fact material to the existence of this Contract and its Arbitration Provision and/or Jurisdiction/Applicable Law Provision, or those Provisions

---

[2] *See Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001)("[A] broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained.").

application to these claims. Accordingly, this Court should dismiss Plaintiff's Amended Complaint, or alternatively stay proceedings, and order this matter to arbitration within the exclusive jurisdiction and subject to the laws of the Cayman Islands.

WHEREFORE, Defendant respectfully requests that this Court enter an order dismissing Plaintiff's Amended Complaint, or in the alternative staying the proceedings, and compelling this dispute to proceed in arbitration in the exclusive jurisdiction of the Cayman Islands pursuant to Rules 12(b)(1), (3), and (6) of the Federal Rules of Civil Procedure, the South Carolina Uniform Arbitration Act, S.C. Code § 15-48-10 *et seq.,* and 9 U.S.C. §1, et seq., of the Federal Arbitration Act.

Respectfully submitted,

<u>s/John A. "Jay" Jones</u>
John A. "Jay" Jones, Esquire, Fed ID 9479
Henry Lucius Laffitte, Esquire, Fed ID 12647
40 Calhoun Street, Suite 315
Charleston, SC 29401
P.O. Box 22768 (29413)
Office: 843.735.7600
Fax: 843.414.8070
jjones@gwblawfirm.com
llaffitte@gwblawfirm.com
***Attorneys for Defendant***
***Premier Assurance Group, LLC***

August 20, 2020
Charleston, South Carolina

4

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| Doyle J. Dreesen, | C/A#: 2:20-CV-02879-MBS |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE TO STAY, AND TO COMPEL ARBITRATION** |
| Premier Assurance Group, SPC, Ltd., | |
| Defendant. | |

Defendant Premier Assurance Group, SPC, Ltd. ("Defendant"), by and through its undersigned attorneys, submits this memorandum in support of its Motion to Dismiss, or in the Alternative to Stay, and to Compel Arbitration pursuant to Rules 12(b)(1), (3), and (6) of the Federal Rules of Civil Procedure, the South Carolina Uniform Arbitration Act, S.C. Code § 15-48-10 *et seq.,* and 9 U.S.C. §1, et seq., of the Federal Arbitration Act. The insurance contract (hereinafter "the Policy" or "the Contract") at issue in Plaintiff's Amended Complaint contains a conspicuous arbitration agreement between the parties in this case, and as a result this dispute should be in arbitration – not litigation.

## FACTUAL ALLEGATIONS IN AMENDED COMPLAINT[1]

The Amended Complaint alleges that Plaintiff and Defendant entered into a valid, binding contract whereby Plaintiff agreed to pay a premium in exchange for health insurance benefits. (*See* ECF No. 7 at ¶ 3). A copy of the Policy's Conditions of Coverage is attached as "Exhibit A" to Defendant's Motion.

---

[1] For the purposes of this Motion, which was filed at this stage pursuant to Rule 12(b) in lieu of filing an Answer, Defendant relies solely on the Amended Complaint allegations and attachments for this recitation of "facts." However, Defendant denies all allegations contained and relief sought against it in Plaintiff's Amended Complaint and demands strict proof thereof.

Section 2 of the Conditions of Coverage for the Policy contains the following Arbitration

Provision:

ARBITRATION

All disputes arising out of or relating to this Policy, or any matter that is related directly
or indirectly to this insurance, which cannot first be resolved by the parties through
settlement negotiations for a period of sixty (60) days, shall be resolved exclusively
through binding, Non -appealable and confidential private arbitration. The arbitration
shall be administered based on the arbitration laws of the Cayman Islands.

 (Exhibit A at 4).

Section 2 of the Conditions of Coverage for this Policy also contains the following conspicuous

Jurisdiction/Applicable Law Provision:

JURISDICTION / APPLICABLE LAW

This policy is governed by, and shall be construed in accordance with the laws of the
Cayman Islands and shall be subject to its exclusive jurisdiction.

This Policy may not comply with laws, regulations or mandatory coverages as required
by the laws of the Policyholder's Home Country, the United States or any other
jurisdiction.

(Exhibit A at 4).

The Amended Complaint allegations never acknowledge or recognize the Arbitration

Provision contained in the Policy, yet the Policy is referenced repeatedly throughout the

Amended Complaint. (*See, e.g.,* ECF No. 7 at ¶¶ 3-5, 8, 10-11, and 15).

The Amended Complaint includes three (3) causes of action, each of which alleges a

breach of the Contract and bad faith or negligent performance of the Contract:

(1) "**Breach of Contract**" alleging that Defendant "breached the policy by
denying benefits and by failing to abide by the terms of the policy and pay
benefits, (ECF No. 7 at ¶ 3);

(2) "**Bad Faith**" and (3) "**Negligence**" alleging that Defendant "acted in bad faith
and/or was negligent, reckless, willful and wanton" in "unreasonably refusing to
provide insurance coverage to Plaintiff" and "failing to honor the insurance
contract" (ECF No. 7 at ¶¶ 3-4);

2

For the reasons outlined below, all of Plaintiff's claims are subject to the Arbitration and Jurisdiction/Applicable Law Provisions in the Contract, and this Court should dismiss the Amended Complaint, or alternatively stay proceedings, and order this matter to arbitration in the Cayman Islands.

## **LEGAL STANDARDS**

Due to the strong South Carolina and federal policy favoring arbitration, arbitration agreements are presumed valid. *See Cape Romain Contractors, Inc. v. Wando E., LLC*, 405 S.C. 115, 125, 747 S.E.2d 461, 466 (2013).   The Federal Arbitration Act ("FAA") permits parties to a written arbitration agreement to "petition any United States District Court … for an order directing that arbitration proceed in the manner provided for in [the parties'] agreement." 9 U.S.C. § 4. In this case, Plaintiff, "the party resisting arbitration[,] bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

Federal Rule of Civil Procedure Rule 12 provides several vehicles by which this Court may compel arbitration in this case, as "motions to dismiss in favor of arbitration [may be brought] under Rules 12(b)(1), (3), and (6)." *Willcock v. My Goodness! Games, Inc*., No. PWG-16-4020, 2018 WL 3970474, *3 (D. Md. Aug. 20, 2018).   Rule 12(b)(1) provides that a party may file a motion to dismiss for "lack of jurisdiction over the subject matter," and Rule 12(b)(3) permits a party to file a motion to dismiss for improper venue.   Rule 12(b)(1), (3), FRCP.   A motion to dismiss is also appropriate under Rule 12(b)(6) if it fails to "state a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 6662, 679 (2009).

Regardless of which 12(b) vehicle is employed, the lawsuit must be dismissed if the plaintiff's claims are subject to a valid arbitration clause. *Choice Hotels, Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709 (4th Cir. 2001); *see also Cox v. Assisted Living Concepts, Inc.*, No. 6:13-00747, 2014 WL 1094394 (D.S.C. Mar. 18, 2014) (granting motion to dismiss and compel arbitration based on Fed. R. Civ. P. 12(b)(1) and holding that "[w]here all of the claims pled by a plaintiff are subject to an arbitration agreement, the court should dismiss the claims rather than merely stay further judicial proceedings").

## ARGUMENT

This dispute is governed by the parties' agreement to arbitrate, and this Court must dismiss the Amended Complaint, or alternatively stay proceedings, and compel arbitration.

### I.    Arbitration Must Be Compelled Under The FAA

In this case, there can be no dispute that the parties' Arbitration Provision falls within the scope of FAA jurisdiction, as the Contract involves "interstate commerce, regardless of whether or not the parties contemplated an interstate transaction." *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001).  The phrase "involving commerce" as used in the FAA has a broad brush; it is "the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).[2]  The Amended Complaint makes clear on its face that interstate commerce is at issue:  the named Defendant is domiciled outside of South Carolina, (Amended Complaint at ¶ 2) and entered into the Contract with Plaintiff, allegedly a South Carolina resident, (Amended Complaint at ¶ 1),

---

[2] The Commerce Clause grants Congress the power to regulate (1) the use of channels of interstate commerce, (2) instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities having a substantial relation to interstate commerce. *United States v. Morrison*, 529 U.S. 598, 609 (2000).

through interstate channels.  The subject matter of the Contract satisfies the broad standard of involving interstate commerce, and application of the FAA is triggered.

## II.    The FAA Mandates That The Arbitration Provision Be Enforced.

As affirmed by the United States Supreme Court in *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 337-338, 131 S. Ct. 1740, 1745 (2011), the FAA declares a liberal policy favoring the enforcement of arbitration agreements in that "courts must place arbitration agreements on equal footing with other contracts, . . . and enforce them according to their term[s]." *See also Parsons v. John Wieland Homes & Neighborhoods of the Carolinas, Inc.*, 418 S.C. 1, 9, 791 S.E.2d 128, 132 (2016) (reaffirming the obligation state courts have to "ensure arbitration agreements 'on equal footing with all other contracts'"). The FAA provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. §2.  In enacting the FAA, Congress sought to overcome widespread judicial hostility to the enforcement of arbitration agreements.  *See Hall St. Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (explaining that the FAA was enacted "[t]o overcome judicial resistance to arbitration").  It is designed "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983); *see also Epic Sys. Corp. v. Lewis,* 138 S. Ct. 1612, 1623 (2018) (noting the "virtues" of arbitration include its "speed and simplicity and inexpensiveness"). To this end, the FAA not only places arbitration agreements on equal footing with other contracts but amounts to a "congressional declaration of a liberal federal policy ***favoring*** arbitration agreements." *Perry v. Thomas¸*482 U.S. 483, 489 (1987) (emphasis added).

5

The FAA requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party to the agreement, consistent with the principle that arbitration is a matter of contract. 9 U.S.C. § 4.  In determining whether to compel arbitration under the FAA, only two "gateway" issues need to be evaluated: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 n.2 (2003); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002).  Before this Court even reaches these gateway issues, however, it must examine the Contract to determine whether the parties have agreed to commit the gateway issues, i.e., the threshold question of arbitrability, to the arbitrator. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) ("An agreement to arbitrate a gateway issue is simply an additional antecedent agreement the party seeking arbitration asks the . . . court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."); *Buckeye Check Cashing, Inc.*, 546 U.S. at 446.   Here, they have.

**A.    Arbitration Must Be Compelled Even Before This Court Addresses The Question Of Arbitrability, Because Plaintiff Agreed That Issues Of Arbitrability Must Be Determined By The Arbitrator.**

"[Q]uestions of arbitrability may go to the arbitrator in two instances: (1) when the parties have demonstrated, clearly and unmistakably, that it is their intent to do so; or (2) when the validity of an arbitration agreement depends exclusively on the validity of the substantive contract of which it is a part." *Jackson*, 561 U.S at 80.  If the language in the Agreement clearly indicates the intent of the parties to refer the question of arbitrability to the arbitrator, as explained below it does in this case, the action should be immediately dismissed and ordered to proceed in arbitration and the arbitrator – not the court – should determine any disputes surrounding the arbitrability of the claims asserted in the case.  *See also Harry Schein, Inc. v.*

6

*Archer & White Sales*, 139 S.Ct. 524, 202 L. Ed. 2d 480 (2019) (finding that when the parties'
contract delegates the arbitrability question to an arbitrator, a court may not override the contract
even if a court believes that the claim of arbitrability is meritless); *Pearson v. Hilton Head
Hosp.*, 400 S.C. 281, 286, 733 S.E.2d 597, 599 (Ct. App. 2012) (noting that arbitrability is an
issue of judicial determination "*unless the parties otherwise provide*") (emphasis added) (citing
*Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 596, 553 S.E.2d 110, 118 (2001)).

In this case, the Arbitration Provision clearly and unmistakably provides that "All
disputes arising out of or relating to this Policy, or any matter that is related directly or indirectly
to this insurance, which cannot first be resolved by the parties through settlement negotiations of
a period of sixty (60) days, shall be resolved exclusively through binding, Non-appealable and
confidential private arbitration. The arbitration shall be administered based on the arbitration
laws of the Cayman Islands." (Exhibit A at 4). Therefore, the parties have delegated any and all
questions regarding arbitrability to the arbitrator. *Pearson*, 400 S.C. at 286, 733 S.E.2d at 599.
As such, this matter should be dismissed summarily and arbitration compelled – even before this
Court addresses the FAA "gateway issues."

**B.    Regardless, Arbitration Must Be Compelled Because The Gateway Issues
Under The FAA Have Been Satisfied.**

Even if this Court was to find that it, rather than the arbitrator, should evaluate the
enforceability and interpretation of the Arbitration Provision, both of the "gateway" issues have
been satisfied here. Therefore, regardless of who decides the issue, all claims should be
dismissed and compelled to arbitration.

**i.    A valid agreement to arbitrate exists and there has been no waiver by
Defendant.**

First, as set forth above, the Amended Complaint alleges that Plaintiff is entitled to
damages as a result of the alleged breach of contract, bad faith and negligence of Defendant. The

Amended Complaint filed by Plaintiff alleges that the Contract was valid and binding and that Defendant breached it, as well as acted negligently and/or in bad faith in its performance of it, causing Plaintiff damages. (ECF No. 7 at ¶¶ 3-4 (Causes of Action)). The Amended Complaint allegations provide no grounds at law or equity to find the Contract invalid or unenforceable; in fact, the Amended Complaint depends upon a finding that the Contract is valid and enforceable.

Defendant has not waived its right to arbitrate (as this Motion is its responsive pleading),[3] so the only remaining question is whether the claims alleged in the Amended Complaint fall within the scope of the Arbitration Provision.

ii.    **Plaintiff's claims all fall within the scope of the Arbitration Provision.**

The FAA requires courts to apply a presumption in favor of arbitrability, *see Moses H. Cone*, 460 U.S. at 24-25, such that any doubts concerning the scope should be resolved in favor of compelling arbitration. *See Landers v. Fed. Deposit Ins. Corp.*, 402 S.C. 100, 109, 739 S.E.2d 209, 213 (2013) ("It is the policy of this state and federal law to favor arbitration and 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'")(quoting *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996)). In this case, there are no doubts as to arbitrability, because as previously outlined, all three (3) of Plaintiff's claims allege either a breach of the Contract or bad faith and negligence in refusing to perform the Contract. Because each and every claim pled in the Amended Complaint seeks relief based upon the subject matter of the Contract, each and every claim pled in the Amended

---

[3] Given the strong South Carolina and federal policy favoring arbitration, parties seeking to establish waiver must show "prejudice through an undue burden caused by delay in [the other party] demanding arbitration." *Liberty Builders, Inc. v. Horton*, 336 S.C. 658, 665, 521 S.E.2d 749, 753 (Ct. App. 1999) (citing *Sentry Eng'g & Constr., Inc. v. Mariner's Cay Dev. Corp.*, 287 S.C. 346, 351, 338 S.E.2d 631, 634 (1985)). Here, there has been no action by Defendant that is inconsistent with asserting his right to arbitration.

Complaint is subject to the Arbitration Provision of the Contract and must be compelled to arbitration.

At the very least, all of the claims alleged in the Amended Complaint meet the liberal standard for arbitrability that applies in this case, because all claims bear a "significant relationship" to the Agreement and its "broadly-worded" Arbitration Provision.  In the Fourth Circuit, "a broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." *Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001); *see also G.E. Capital Corp. v. Union Corp Fin. Group*, 142 Fed. Appx. 150, 153 (4th Cir.2005) ("[T]he test for an arbitration clause of this breadth is not whether a claim arose under one agreement or another, but whether a significant relationship exists between the claim and the agreement containing the arbitration clause."). There can be no question that the language used in the Arbitration Provision – "All disputes arising out of or related to this Policy, or any matter that is related directly or indirectly to this insurance" – is a "broadly-worded" arbitration clause. The Fourth Circuit has characterized the "arising out of or relating to" language nearly identical to this as a "broad agreement." *See American Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 90 (4th Cir. 1996) ("Any dispute, controversy, or claim arising out of or related to this Consulting Agreement shall be resolved by binding arbitration."); *Long*, 248 F.3d at 313 ("any dispute arising out of or relating to this Agreement ... will be submitted by the parties to binding arbitration ..."); *Hinson v. Jusco Co., Ltd.*, 868 F.Supp. 145, 146 (D.S.C. 1994) ("Any controversy or claim arising out of or relating to this Agreement ... shall be settled by binding arbitration ..."). For all of these reasons, the "significant relationship" test undoubtedly captures all of Plaintiff's claims and compels them to arbitration.

Here, there can be no doubt that the Amended Complaint in its entirety "falls within the scope of the arbitration clause, [such that] the Court must refer the matter to arbitration without reviewing the merits. *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 457 (4th Cir. 1997) ("[T]he district court's role is limited to determining whether the contract to arbitrate is valid and the dispute involved in the arbitration is within the subject matter of the contract to arbitrate.").

### III.  Dismissal Is The Appropriate Course Of Action When Arbitration Is Compelled, But Alternatively Defendant Requests A Stay Of Proceedings.

When – as here – all of the claims pled in the case are subject to arbitration, dismissal is the most appropriate course of action.  *See Vanessa Hughes, Plaintiff, v. Charter Commc'ns, Inc., d/b/a Spectrum Defendant.*, No. 3:19-CV-01703-SAL, 2020 WL 1025687, at *11 (D.S.C. Mar. 2, 2020)("In this case, it is undisputed that all of Plaintiff's claims are subject to arbitration and, therefore, the court will dismiss the case.").  Despite "some tension" in the Fourth Circuit over the discretion afforded a district court in dismissing some actions compelled to arbitration, *Aggarao v. Mol Ship Mgmt. Co., Ltd*., 675 F.3d 355, n.18 (4th Cir. 2012), the Fourth Circuit has made clear that dismissal is the proper remedy when ***all*** of the issues presented in a lawsuit are subject to arbitration. *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc*., 252 F.3d 707, 709–10 (4th Cir. 2001) ("Notwithstanding the terms of § 3 [of the FAA][4] however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable."); *see also Greenville Hosp. Sys. v. Employee Welfare Ben. Plan for Emps. of Hazelhurst Mgmt. Co*., 628 F. App'x 842, 845–46 (4th Cir. 2015) (affirming dismissal where district court determined all issues were arbitrable).  Thus, while it is appropriate to stay a case pending an arbitration decision in lieu of dismissing it when fewer than all claims are subject

---

[4] Section 3 of the FAA suggests that the proper course of action, upon motion by any party, is to stay the proceedings pending arbitration, rather than dismiss the case outright. 9 U.S.C. § 3.

to arbitration, here, *all* claims are subject to arbitration. For that reason, dismissing the case is appropriate.

Alternatively, to the extent that this Court decides the case should not be dismissed when compelling it to arbitration, or that some but not all of the issues should be compelled to arbitration, the proceedings at least must be stayed pursuant to § 3 of the FAA. *See Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1461 (4th Cir. 1992), as amended (June 23, 1992) ("The decision whether to stay the litigation of the non-arbitrable issues is a matter largely within the district court's discretion to control its docket.").

### <u>CONCLUSION</u>

Because there is a dispute between Plaintiff and Defendant, a written Contract with an Arbitration Provision governing all claims in the dispute, a relationship with interstate commerce, and a failure by Plaintiff to arbitrate its dispute with Defendant, the Court should dismiss Plaintiff's Amended Complaint, or alternatively stay proceedings, and compel Plaintiff to proceed in arbitration pursuant to 9 U.S.C. § 4 of the FAA, the SCUAA, and Rules 12(b)(1), (3), and (6) of the Federal Rules of Civil Procedure.

[Signature Page to Follow]

Respectfully submitted,


s/John A. "Jay" Jones
John A. "Jay" Jones, Esquire, Fed ID 9479
Henry Lucius Laffitte, Esquire, Fed ID 12647
40 Calhoun Street, Suite 315
Charleston, SC 29401
P.O. Box 22768 (29413)
Office: 843.735.7600
Fax: 843.414.8070
jjones@gwblawfirm.com
llaffitte@gwblawfirm.com
***Attorneys for Defendant***
***Premier Assurance Group, SPC, Ltd.***

August 20, 2020
Charleston, South Carolina

EFFECTIVE: SEPTEMBER 1 2018

Expatriate Health
**Conditions
of Coverage**



# TABLE OF CONTENTS

General Provisions ------------------------------------------------------------------------------- 1

Terms and Conditions---------------------------------------------------------------------------2

Eligibility and Conditions of Coverage ------------------------------------------------------5

Health Care Coverage and Benefits ---------------------------------------------------------6

Plan Deductibles, Co-Payments and Co-Insurance Maximums------------------------7

Pre-Certification Requirements and Procedures------------------------------------------7

Preferred Provider Organization--------------------------------------------------------------7

Payable Benefits ---------------------------------------------------------------------------------8

Additional Payable Benefits----------------------------------------------------------------- 11

Exclusions and Limitations --------------------------------------------------------------------13

Claims Administrative Procedures-----------------------------------------------------------15

How to File a Claim-----------------------------------------------------------------------------17

Claims Appeals Procedures-------------------------------------------------------------------17

Definitions-----------------------------------------------------------------------------------------17



## ABOUT THIS POLICY WORDING

This is a policy wording showing all benefits available under the different international insurance plan options and additional riders offered by PA Group. Some benefits in this document may not apply to your plan choice. Please check your Schedule of Benefits (SOB) for the sections covered under your plan option.

## OUR PHILOSOPHY

Our philosophy is to provide our members with the best health coverage, excellent customer service, guidance and support.

Our Customer Service experts are available to assist you 24 hours a day, 7 days a week, 365 days a year. Personalized support is available via phone, e-mail, or fax to:
- Help you understand your benefits
- Respond questions on claims status
- Assist you locating a specific provider

## CUSTOMER SERVICE TEAM

With our services, we provide Case Management, Clinical support, and reviews. The experts in our customer service and medical team have the right combination of skills to give you the best support and guidance on all of your health care needs.

This is our centralized point of contact for any member services and information, including worldwide coordination of routine and urgent medical care. You may contact our Customer Service Team by calling the numbers provided in your ID card.

## TOOLS AND RESOURCES

As part of our services you will be given access to your online member portal, where you can make updates to your information, learn about the status of your claims and:
- Search healthcare providers
- Request pre-certifications online
- Download an Electronic ID at any time
- Submit claims online

## ACCESS TO PROVIDERS

Expatriate Health is proud to count with an extensive network of top-ranked providers, internationally and in the United States. We offer our clients a powerful online tool to find doctors, hospital or any other healthcare professional in our network.

## REVIEW PERIOD

You have 15 days from the effective date in your Certificate of Coverage to review all of your plan's benefits, terms, conditions, limitations and exclusions of coverage. Please read this document carefully and make sure you understand how the Expatriate Health plan option that you selected and additional riders purchased (if

any) completely satisfy your healthcare needs. If you have any questions, would like to change your plan option, or cancel your policy, please contact: healthservice@pagroupco.com.

## 1 GENERAL PROVISIONS

The covered person, whose name is indicated in the Certificate of Coverage as "Policyholder", hereinafter shall be referred to as the "Policyholder" domiciled at the foreign address indicated on the Expatriate Health Application.

And; Second party, Premier Assurance Group SPC, Ltd on behalf of the Global Assurance Segregated Portfolio, hereinafter shall be referred to, sometimes collectively, as the "Insurer", "Company", "We" or "Us". Premier Assurance Group SPC Ltd is a segregated portfolio company licensed as an insurance company in the Cayman Islands and supervised by the Monetary Regulatory and Advisory Body of the Cayman Islands.

The policy is issued through a Trust, PA Global Trust and the Primary Insured receives a Certificate of Coverage with respect to the Health Plan.

Third Party Administrator (TPA), a designated entity (PA Group Administration) by the Insurer for purposes of providing administration services of this policy on behalf of the Company, hereinafter referred to, sometimes collectively, as the "Plan Administrator".

The declarations of the Applicant and of his eligible dependents serve as the basis for the policy. Any references in this Policy to the Policyholder and dependents that are expressed in the masculine gender shall be interpreted as including the feminine gender whenever appropriate. In addition, any references to the singular include the plural and references to the plural include the singular.

**The policy providing your coverage and the Insurer providing this policy have not been approved by the Florida Office of Insurance Regulation.**

## ENTIRE POLICY AND CHANGES

This Policy, the Policyholder application, schedule of benefits and any amendments, endorsements or riders (if any) comprise the entire Contract between the parties, hereinafter referred to, sometimes collectively, as the "Policy" or "Plan".

When the Policyholder requests any changes to this policy, they must be done on the Anniversary Date of the policy. The changes will be valid only if made by a new Policy Wording, a Policy Amendment or Endorsement or by a Policy Rider duly approved and signed by an Officer of the Insurer.

No change may be made to this Policy unless an Officer of the Insurer approves it. A change will be valid only if made by a Policy Endorsement signed by an Officer of the Insurer, or an amendment



of the Policy in its entirety issued by the Insurer. No agent or other person may change this Policy or waive any of its provisions.

If any dispute arises as to the interpretation of this document, the English version of this document shall be deemed to be conclusive and taking precedence over any other language version of this document.

## POLICY PERIOD

This Policy is designed for a 12-month commitment. Any changes in plan option, deductible, or coverage, may only take place upon the Anniversary Date, unless We specifically agree otherwise.

## NOTIFICATIONS

Any notice required under this contract must be in writing. Any Notice given by Us will be communicated to either the Policyholder or the Policyholder's agent or broker. Delivery of such notice is limited to E-mail, postal mail or via member portal. Any notice given by the Policyholder must be addressed and sent to the Plan Administrator Office or via e-mail to healthservice@pagroupco.com.

## GUARANTEED RENEWABILITY

Ensures the Policyholder and his eligible Dependents will not be denied renewal of their policy because of their age or claims history, provided that premiums are paid within the stipulated time.

The Company will inform the Policyholder, at least thirty (30) days in advance, if the plan ceases to operate and will inform the insured of any similar plans benefit options available where the insured can renew the policy.

## WAITING PERIOD

This Policy contains a thirty (30) day Waiting Period, during which only infection originated diseases and Accidental Injuries occurring by the first time within this period, will be covered.

At the Insurer's discretion, only this 30-day Waiting Period will be waived if:
- Other medical expense insurance for the Insured was in effect with another company for at least one consecutive year, and
- The effective date of this policy begins within 60 days of the expiration of the previous coverage, and
- The prior coverage is disclosed in the health application, and
- The prior policy and a copy of the receipt for the last year's premium payment are submitted with the health application.

If the Waiting Period is waived, lifetime benefits payable for any condition manifested during the first 30 days of coverage are limited, while the policy is in effect, to the lesser benefit provided by either this policy or the prior policy.

If a Waiting Period is waived, it refers to this 30-day Waiting Period only, and any other Waiting Period is not affected and will be applied as determined in this policy.

## 2 TERMS AND CONDITIONS

## PREMIUM PAYMENT AND RENEWALS

The premium due for coverage under this policy is for a one (1) year term commitment. It must be paid in US dollars on or before the Premium Payment due date. All coverage under this Policy is subject to the timely payment of Premium, which must be made payable to the Plan Administrator. Payment in any other forms of currency will not be accepted and will be considered as nonpayment of Premium unless otherwise agreed by the Insurer. The policy and rates are guaranteed for one year and are continually subject to the terms enforced at the time of each renewal date. Coverage is not effective unless premium is paid in full.

The Policyholder is responsible for the payment of the renewal premium. Premium notices are provided as a courtesy and the Insurer provides no guarantee of delivering premium notices. If a Policyholder has not received a premium notice thirty (30) days prior to the Due Date and the Insured does not know the correct renewal premium payment, the Insured should contact his producer or the Plan Administrator.

## GRACE PERIOD

If premiums are not received by the Premium Payment Due Date, the Insurer will allow a Grace Period of thirty (30) days from the due date to continue coverage. If the premium is not received by the Insurer prior to the end of the Grace Period, this Policy and all of its benefits will be deemed terminated as of the last Premium Payment Due Date. Benefits are not provided under the Policy during the Grace Period, unless the premium payment has been collected.

There will be a service fee for any checks returned for insufficient funds, closed accounts, or for stop payments on checks. Returned checks will be treated as non-payment of Premiums.

## COMMENCEMENT AND END OF COVERAGE

The Policy term begins at 00:01 hours Eastern Standard Time (EST) on the Effective Date of the Policy as indicated in the Certificate of Coverage and ends at midnight 365 days later.

## POLICY AND RATE MODIFICATIONS

At the Anniversary Date the Insurer has the right to change the Premium and/or policy terms, based on any Insured's demographic or geographic change.



## OTHER PREMIUM CHANGES

Premium changes due to the following will occur automatically and will be charged from the date the change occurs:
- Changes in benefits provided under the Policy; or
- Additions, deletions, increases or decreases of a Policyholder's dependent's insurance; or
- Addition of a new Insured; or
- Termination of an Insured;

Any such change will be prorated to the Premium payment period of the Policyholder and reflected on the Policyholder's next billing statement. Changes in a Person's age are considered changes in the demographics of the Insured Policyholder. Resulting premium changes will occur and are assessed upon renewal date.

## REINSTATEMENT OF POLICY

If the Policy has been terminated for non-payment of premium due, the Insurer will consider its Reinstatement only after payment of the premium and submission of the Reinstatement Application Form, which will be subject to underwriting evaluation. The policy can be reinstated within the next 90 (ninety) days after expiration of the last Premium Payment Due Date. The Reinstatement will occur when the Insurer:
- A) Approves the Reinstatement Application Form, and
- B) Accepts the overdue premiums.

Reinstatement is not guaranteed and the company is under no obligation to accept the reinstatement. If approved, the reinstatement with its new conditions and/or restrictions, if any, will be effective on the renewal date of the policy, without gap of coverage.

## CLERICAL ERROR

Any clerical error or delays in keeping records by the Company:
- A) Will not deny insurance which should otherwise have been granted; and
- B) Will not extend insurance which should otherwise have been terminated; and
- C) Will be subject to proper adjustment of premium when an adjustment is needed

## REFUND PROVISION

The full premium will only be reimbursed to the Policyholder if the Insured decides to cancel their insurance coverage within fifteen (15) days from issuance of their certificate of coverage.

After 15 days, if coverage is terminated for any reason, we will refund the pro-rated premium amount based on the unearned number of months of the coverage paid, less the administrative charges and thirty five percent (35%) of the base premium if no claim payments have ever been made.

## DURATION OF COVERAGE

Benefits are paid to the extent that an Insured receives any of the treatments covered under the Schedule of Benefits following the Effective Date of the Policy, including any additional Waiting Periods and up to the date such individual no longer meets the definition of Insured.

## POLICY CANCELLATIONS / TERMINATIONS OR NON-RENEWAL

The Company reserves the right to cancel or terminate this policy as described below:
- This policy will be canceled automatically upon non-payment of the premium.
- The Company may at any time terminate an Insured or cancel the policy at any time if:
  - Statements on the Application Form are found to be misrepresentations or are incomplete or incorrect, or if Fraud has been attempted;
  - Knowingly, the insured claimed benefits for any purpose other than are provided for under this policy;
  - The Insured agreed to any attempt by a third party act or omission to obtain an unreasonable pecuniary advantage to our detriment;
  - Failed to observe the terms and conditions of this policy, or failed to act with utmost good faith.
  - Upon written request from the Policyholder to terminate coverage for a Dependent.

## CANCELLATION BY THE INSURED

The Insured Person shall have fifteen (15) days from the Initial Effective Date of Coverage (the "Review Period") to review the benefits, conditions, limitations, exclusions and all other Terms of the Policy. If not completely satisfied, the Insured Person may request cancellation of this insurance retroactive to the Initial Effective Date of Coverage by sending a written request to the Company by mail or fax and received by Us within the Review Period, thereby qualifying to receive a full refund of Premium paid. Upon effectuation of such cancellation and refund, neither the Company nor the Insured Person shall have any further rights, liabilities or obligations under this insurance.

After the Review Period, the Insured Person may request cancellation of the policy by giving the Company not less than sixty (60) days advance written request. Cancellation is at the sole option of the Company, except as provided in the Renewal amendments section, and the Company may request and/or require the Insured Person to execute a release of claims as a condition to and/or in consideration of granting such cancellation. If the Company grants cancellation, coverage for the Insured Person under this insurance shall terminate with effect from the cancellation date specified by the Company. The Company shall calculate the amount of Premium earned upon the Declaration and Certificate through the requested date of cancellation, and refund the difference, if any.



## FRAUDULENT / UNFOUNDED CLAIMS

If any claims are presented under this policy and are in any respect fraudulent or unfounded, or if any fraudulent means or devices are used by the Insured or anyone acting on the Insured's behalf, such as misrepresentation on the Application Form, omissions of information or any attempts, through deceit, to obtain benefits for any person that otherwise would not be provided or payable, benefits otherwise payable shall be forfeited, and benefits paid shall be recoverable.

We will terminate the policy as of its Effective Date and all premiums paid shall be forfeited.

## JURISDICTION / APPLICABLE LAW

This policy is governed by, and shall be construed in accordance with the laws of the Cayman Islands and shall be subject to its exclusive jurisdiction.

This Policy may not comply with laws, regulations or mandatory coverages as required by the laws of the Policyholder's Home Country, the United States or any other jurisdiction.

## ARBITRATION

All disputes arising out of or relating to this Policy, or any matter that is related directly or indirectly to this insurance, which cannot first be resolved by the parties through settlement negotiations for a period of sixty (60) days, shall be resolved exclusively through binding, Non-appealable and confidential private arbitration. The arbitration shall be administered based on the arbitration laws of the Cayman Islands.

Notice requesting arbitration must be in writing and sent certified or registered mail, return receipt requested, to service office 1901 Ponce De Leon Blvd. Coral Gables, Florida 33134.

Each party shall choose one arbitrator, and the two arbitrators shall choose an impartial third arbitrator, who shall preside over the arbitration proceeding. If either party fails to appoint its arbitrator within thirty (30) days after being requested to do so by the other party, the latter, after ten (10) days' notice by certified mail or registered mail of its intentions to do so, may appoint a third arbitrator.

Within thirty (30) days after notice of appointment of all arbitrators, the panel shall meet and determine timely period for briefs, discovery procedures and schedule for hearings. The panel shall be relieved of all judicial formality and shall not be bound by the strict rules of procedure and evidence. The decision of any two arbitrators when rendered in writing shall be the final and binding. The panel is empowered to grant interim relief, as it may deem appropriate. The place of any arbitration hearing shall be The Cayman Islands.

The panel shall interpret this Contract as an honorable engagement rather than as merely a legal obligation and shall make its decision considering the custom and practice of the applicable insurance business as promptly as possible following the termination of the hearings. The law applicable to the insurance policy and the arbitration proceedings shall be the law of The Cayman Islands.

## COMPLIANCE WITH THE POLICY TERMS

The Insurer's liability under this policy will be conditional upon each Insured complying with its terms and conditions.

## TYPE OF COVERAGE

Coverage under this Plan for benefits is non-occupational. Only non-occupational accidental injuries and non-occupational diseases are covered. Any coverage for charges for services and supplies is provided only if they are furnished to a person while covered.

If you are employed at a location that is not governed by a worker's compensation law or similar law providing occupational coverage, the terms "non-occupational disease" and "non-occupational injury" shall also mean any disease or injury which arises out of or in the course of your work with your Employer, provided you are not covered under any worker's compensation coverage.

## INSURED DUTY OF DISCLOSURE

The policyholder must inform the Company within 30 days, of any changes related to Insured (such as change of address or marital status) or of any other material changes that affect information given in connection with the application for coverage under this policy. The Company reserves the right to alter the policy terms or cancel coverage if the insured fails to notify Us.

## PRIVACY

The confidentiality of your information is of paramount concern to the Company. The Company complies with Data Protection requirements and Medical Confidentiality Guidelines. Information submitted to the Company over our website is normally unprotected until it reaches us. We share information only as it pertains to the administration of your health care benefits.

## SETTLEMENT OF CLAIMS / CURRENCY

All paid claims will be settled in the same currency as the premium currency. If the insured pays for treatment, or receives a bill for covered services in a currency other than premium currency, including bills sent directly to the Company or its Plan Administrator, such payments and bills shall be converted to premium's currency at the exchange rate in effect at the time such service was rendered, unless otherwise arranged by mutual agreement between Us and the insured.

## RIGHT TO ENFORCE CONTRACT PROVISION / WAIVER

Waiver by the Company of any term or condition of this policy will not prevent us from relying on such term or condition thereafter. If



we choose to waive our rights under this policy regarding a specific term or provision, it shall not be interpreted as a waiver of Our right to administer or enforce this Policy in strict accordance with its terms and conditions.

## EXAMINATIONS

The Company and the Plan Administrator shall have the right and opportunity, through their medical representatives, to examine any person whenever and as often as they may reasonably require within the duration of any claim. The Insured shall make available all medical reports and records, as well as requested health information questionnaires, and where required, shall sign all authorization forms necessary to give the Company a full and complete medical history. The Company and the Plan Administrator shall have the right and the opportunity to require an autopsy in the case of death.

## DEATH OF INSURED / TRANSFER

If the Policyholder dies, this policy's ownership will automatically be transferred to the surviving spouse, if already covered in the same policy, otherwise, to the oldest Insured over the age of 18 years who shall, upon the death of the Policyholder, become the primary insured for all purposes of this policy and be responsible for paying the premium.

If the dependent is a minor, the policy will continue in force, only if an adult is included in the policy as a contracting party. Such adult will have no coverage under this policy and will not have to pay any insurance premium. The minor must pay the premium corresponding to an adult 18 years of age.

Coverage will continue with the same plan, deductible and conditions of the original policy.

Upon death of the primary insured the Insurer must be notified and a death certificate must be submitted within 30 days.

## DENIAL OF LIABILITY

Neither the Insurer nor the Policyholder is responsible for the quality of care received from any institution or individual. This Policy does not give the Insured any claim, right or cause of action against Insurer or Policyholder based on an act of omission or commission of a Hospital, Physician or other provider of care or service.

## 3 ELIGIBILITY AND CONDITIONS OF COVERAGE

### APPLICATION

All applicants are subject to underwriting. Acceptance is not guaranteed. Additional exclusions may also apply. Non-disclosed Pre-existing Conditions are not covered.

### ELIGIBILITY

In connection with the policy, the applicant must comply with the following requirements:
- Reside outside of the United States of America.
- Be in good health and not confined to a hospital or nursing home, not be hospitalized or disabled;
- Complete an application and premium must have been paid;
- Be under the age of seventy-five (75), may apply up to the day before they attain age 75.

### ELIGIBLE DEPENDENTS

Provided family coverage has been elected, coverage under this Policy can be extended to the following family members as Insured Dependents:
- The Applicant's spouse or domestic partner
- Applicant's natural children, legally adopted children, and stepchildren.
- Unmarried Dependent children up to the day before they attain age 19, or up to the day before they attain age 26 if single and a full-time student at an accredited college or university in or outside their Host Country. Confirmation of full-time student status (minimum 10 credits per semester) is required.

### ADDITION OF NEW DEPENDENTS

To enroll or add new Dependents after the effective date of the policy, the Insured must submit an Application Form, which will be subject to underwriting evaluation. Coverage will be effective from the date the enrollment is accepted, provided that premium payment has been received. The new Dependent will be subject to the Waiting Periods and all other terms and conditions of the Policy.

### ADDITION OF A NEWBORN BABY

Addition of newborn babies, born under a Covered Pregnancy under this Policy to the female Insured or to the Insured's spouse, not to an Insured's dependent daughter, will be effective on the child's date of birth provided that:
- Written notification to the Insurer is given within ninety (90) days of the date of birth. The newborn child shall be accepted



from the date of birth, for full coverage according to the terms of the Policy, regardless of health status.
- Birth certificate, and required premiums are received.
- The newborn baby will be enrolled under the same coverage as the Primary Insured.
- If the Insured fails to enroll the newborn eligible dependent within ninety (90) days from date of birth, coverage is not guaranteed and an application must be submitted for the new Dependent, and it will be subject to full underwriting. The new Dependent will be covered from the date that the Insurer accepts the addition.

## ADDITION OF A LEGALLY ADOPTED CHILD

Adopted children may be covered subject to the following conditions:
- The child must be less than 19 years old, and
- The Insured will submit an application along with an official copy of the legal adoption document and,
- The applicant will be subject to full underwriting.

The Insured Dependents will be covered from the date that the Insurer accepts application.

## CHILDREN WITH DISABILITIES

Coverage for your child with total and permanent physical or mental disability due to a condition covered by this policy will continue past the Maximum age for a dependent child. Proof that your child is permanently impaired must be submitted to the Company no later than 30 days after the date your child reaches the maximum age.

This benefit covers children with disabilities, such as mental retardation or a physical handicap, which started as a result of a condition covered by this policy and prior to the date he/she reaches the maximum age for dependent children.

Coverage will cease on the first to occur of:
- Cessation of the impairment;
- Failure to give proof that the impairment continues;
- Failure to have any required exam;
- Termination of Dependent Coverage as to your child for any reasons other than reaching the maximum age.

The Company will have the right to require proof of the continuation of the handicap.

The Company also has the right to examine your child as often as needed while the handicap continues at its own expense. An exam will be required once a year after the disabled dependent reaches the maximum age.

## DEPENDENT CHILD AGE LIMIT

When a Dependent child, who is covered under an existing policy, marries or attains age nineteen (19) or attains twenty–six (26) if single and a full time student in an accredited college

or university, coverage will continue until the end of the Policy year. Thereon the Company will issue a separate Policy with the same plan option, deductible and conditions of the previous one. Coverage will continue provided that a new application is submitted (not subject to underwriting evaluation) and the applicable premium is paid within thirty (30) days of the date of commencement. New applicants who are already 26 years old are not eligible dependents and must submit an application to obtain their own separate policy.

## DIVORCE OR SEPARATION

If marital status changes, the Insured should notify the company within thirty (30) days of the date of the divorce or separation.

## CONTINUATION OF COVERAGE FOR ELIGIBLE DEPENDENTS

If an eligible dependent ends their coverage under this policy, for any reason, except when terminated by the Company, the former dependent should submit an application within thirty (30) days from the date the coverage as dependent ended. The Company will issue a separate Policy with the same plan option, deductible and conditions of the previous one, and coverage will continue provided that the applicable premium is paid within thirty (30) days from the date of commencement.

## CHANGE OF HOST COUNTRY

If the insured or a dependent changes his residence to another country, the Company must be notified in writing within 30 days of the change and the Insurer retains the right to modify the premium and the policy terms. To be eligible for this policy, you must reside outside of the United States (U.S.) or your Home Country. However, Visits to U.S. or Home Country are allowed up to a max of 180 days in any 365-day period. Should an Insured remain in the U.S. or Home Country longer than 180 days in any 365-day period, coverage will terminate at the end of the 180th day.

## 4 HEALTH CARE COVERAGE AND BENEFITS

## SCOPE OF COVERAGE

The Policy covers within the geographical areas as shown in the Schedule of Benefits. Medical services are covered up to the limit shown in the Schedule of Benefits. All services must be Medically Necessary and approved by the U.S. Food and Drug Administration (FDA) for the Insured's Injury or Illness.

## USUAL, CUSTOMARY AND REASONABLE (UCR) CHARGES

All benefits are subject to Usual, Reasonable, and Customary Charges. The Insured is responsible for the payment of any balance



over the UCR charge, in addition of any applicable deductible and co-insurance.

## 5  PLAN DEDUCTIBLES, CO-PAYMENTS AND CO-INSURANCE MAXIMUMS

Payment of Benefits as set forth in the Schedule of Benefits is subject to the Policy Year Deductible, Co-payments and Co-insurance maximums and any other limitations set forth in the policy, unless otherwise noted. Please refer to the Schedule of Benefits to review the maximums in accordance with elected plan option.

Deductible is applied once per policy year, for each Insured person, up to a maximum of two (2) full deductibles per insured family per policy year. The policy will start to pay benefits to the Insured person that satisfies a full deductible, and when two Insured individuals satisfy their corresponding deductible, the plan will pay full policy benefits for these Insureds and for any other covered family member, without any additional deductible for the remaining of the ongoing policy year.

Insurer adjudicates claims in the order in which they are received. When claims are presented to the Plan Administrator, the allowable charges will be applied towards the selected Deductible, Co-payments and Co-Insurance maximums that may be applicable and will then be calculated and reimbursed at the percentage listed on the Schedule of Benefits.

## DEDUCTIBLE CARRY OVER

Any covered expenses incurred by the insured during the last three (3) months of the Policy Year, which are used to satisfy that Policy Year's Deductible, will be carried over and applied towards the Insured's deductible for the following Policy Year.

## 6  PRE-CERTIFICATION REQUIREMENTS AND PROCEDURES

Pre-Certification is a process by which an Insured obtains approval for certain non-emergency, medical procedures or treatments prior to the commencement of the proposed medical treatment. This requires a completed Pre-Certification Request form submitted to the Plan Administrator at least 5 business days prior to the scheduled procedure or treatment date, along with the complete medical records for our Plan Administrator to determine medical necessity and confirm coverage in accordance with the terms of the policy. Outside of the United States a cost estimate of treatment will also be required at the time of the request.

**Please note:** some treatment requests may require longer than 5 days for the review process to be completed.

The following services require Pre-Certification:
- Hospitalization
- Admission to an Extended Care Facility
- Diagnostic Testing
- Surgery requiring general or local anesthesia
- All Cancer Treatment
- Home Health Care
- Organ Transplants
- Repatriation of Mortal Remains/Burial Services
- Medical Air Evacuation
- Rehabilitation Services

## MEDICAL EMERGENCY AUTHORIZATIONS

**Completed Pre-Certification request form must be received within 72 hours of the emergency** admission or procedure. In instances of medical emergency, the Insured should go to the nearest Hospital or provider for assistance even if that Hospital or provider is not part of the Preferred Provider Network (PPO) Network.

**Failure to Request Pre-Certification** will result in claim being penalized 30% of covered expenses for the entire episode of care. Penalty will not count towards out of pocket maximums if any are applicable.

**Notwithstanding the requirement to pre-certify,** pre-certification approval does not guarantee payment.

Pre-certified benefits are still subject to eligibility at the time charges are actually incurred, and to all other terms, limitations, and exclusions of the Policy.

## 7  PREFERRED PROVIDER ORGANIZATION

The Insurer maintains a Preferred Provider Organization (PPO) both inside the United States and an outside the United States. This is a network of medical providers and facilities with which it has arranged direct settlement procedures.

The Insurer requires the use of a PPO provider where available. However, in instances of medical emergency, the Insured should



go to the nearest Hospital or provider for assistance even if that Hospital or provider is not part of the PPO.

For non-emergency treatment, outside of the Preferred Provider Organization, Claims will incur a penalty of 50% of the entire episode of care.

In addition to the penalty, the Insured is still liable for the deductible and co-insurance where applicable.

For updated information on the providers and facilities within the Preferred Provider Organization, please log into your member portal or contact the Plan Administrator.

## 8  PAYABLE BENEFITS

This policy will pay for the following benefits up to the limits established in the Schedule of Benefits, subject to the corresponding Waiting Period, if any, when they have been pre-certified and they are medically necessary and provided by licensed Physician or Provider.

### INPATIENT SERVICES

Benefits are provided per the Schedule of Benefits for inpatient care.
- Hospital room and Board including special diets and general nursing care
- Intensive Care Unit (ICU)

### INPATIENT ANCILLARY HOSPITAL SERVICES
- Operating and recovery room
- All medicines administered during hospital stay
- Blood transfusions, blood plasma, blood plasma expanders, and all related testing, components, equipment and services
- Surgical dressings
- Laboratory testing
- Internal Prosthesis and Implants
- Diagnostic X-ray examinations, MRI, CT Scans and PET Scans
- Radiation therapy
- Respiratory therapy
- Chemotherapy
- Physical and Occupational therapy

### INPATIENT PHYSICIAN / SPECIALIST VISITS

Inpatient physician visits are limited to one per day per specialty.

Visits that are part of normal preoperative and postoperative care are covered under the surgical fee and Insurer will not pay separate charges for such care.

### INPATIENT / OUTPATIENT SURGICAL PROCEDURES

Charges for the treatment or diagnosis of a covered illness or injury including, but not limited to operating room, medical and surgical supplies.

### INPATIENT / OUTPATIENT SURGEON FEES

Physician charges for the performance of a surgical procedure to treat a covered illness or injury.

Follow up visits for the first 60 days following the surgery form part of the global surgical fee and are not reimbursable as a separate fee.

### INPATIENT / OUTPATIENT ASSISTANT SURGEON FEES

Limited in total to a maximum of twenty percent (20%) of the fees approved for the principal surgeon for the surgical procedure. Assistant surgeon is covered based on medical necessity and if surgical procedure calls for an assistant as standard industry protocol. Assistant surgeon must be authorized prior to the surgery taking place.

### INPATIENT / OUTPATIENT ANESTHESIOLOGIST

Charges made by an anesthesiologist for the performance of a surgical procedure are covered up to thirty (30%) percent of the fees approved for the principal surgeon.

### PRE-ADMISSION TESTING

Any necessary pre-admission tests must be performed before a non-emergency hospitalization.

### EXTENDED CARE FACILITY

Benefits are available for Inpatient treatment and services provided in a pre-approved Extended Care Facility following, or in lieu of, an admission to a Hospital as a result of a covered illness, disability or



injury. Intermediate, custodial, rest and homelike care services will not be covered. Covered services include:

- Skilled nursing and related services on an inpatient basis for patients who require medical or nursing care for a covered illness or injury
- Treatment must be under the direct supervision and control of a specialist and would cover for the use of special treatment rooms

Care must begin immediately following hospital stay of no less than 3 days. Insurer has the right to review an admission, as it deems necessary, to determine if the stay is medically appropriate.

Insurer will reimburse one Physician visit per day per specialty while the Insured is a patient in a Hospital or approved Extended Care Facility. Visits that are part of normal preoperative and postoperative care are covered under the surgical fee and Insurer will not pay separate charges for such care. Please refer to schedule of benefits for maximum amounts or days, as these are based on plan option elected.

## CHIROPRACTIC SERVICES

Benefit is covered if prescribed by an attending physician to relieve back pain and accompanied by the proper X-rays and any other images that need to be taken in order to confirm the diagnosis. The Plan administrator will allow for five (5) sessions without a treatment plan. Any additional sessions past the initial five is subject to a treatment plan indicating the frequencies and duration by the attending physician. All treatments in connection with Chiropractic services, including manipulations, is limited to the amount specified under the plan option elected by the member.

## DIAGNOSTIC TESTING

Diagnostic testing including but not limited to MRI, CT Scans, PET Scans, endoscopy, colonoscopy, gastroscopy, cystoscopy ultrasound and laboratory tests are covered.

## DIALYSIS

A medical condition requiring dialysis will be covered, if it was first diagnosed while the policy is in force.

## EMERGENCY ROOM SERVICES

Coverage of Emergency room visits must meet the definition of Emergency for coverage to be provided.

## EMERGENCY GROUND AMBULANCE

Benefits up to the limits of the chosen plan are provided for emergency ground ambulance transportation to the nearest Hospital able to provide the required medical care. The use of ambulance services for the convenience of the Insured, which are not medically necessary, will not be considered a covered service. Coverage is extended to one way trip to the hospital.

## HOME HEALTH CARE SERVICES

Will be covered up to the limits of the chosen plan when: a) Rendered in the Insured's home by a Home Health Care Agency; b) established and, approved in writing and certified, by the attending Physician upon discharge from the hospital based on physicians instructions, as required for the proper treatment of the Injury or Illness; c) in place of inpatient treatment in a Hospital or in an Extended Care Facility.

## HOSPICE CARE

Treatment of the terminally ill patient, as certified by the attending Physician, is covered up to the limit of the chosen plan as a combined benefit for hospice services while admitted in a hospital and home hospice.

## OUTPATIENT PHYSICIAN VISITS / SPECIALIST VISITS

Plan will cover up to one visit per day per specialty for treatment of a covered illness or injury.

## ONCOLOGY / CANCER TREATMENT

Benefits will be covered for inpatient or outpatient treatment including Oncologist fees, surgery, radiation therapy, chemotherapy and Prescription Medication. This benefit also includes one wig and one breast prosthesis built in bra.

All treatment and medications must be FDA Approved.

Breast Reconstruction will be covered when a mastectomy due to cancer has been performed and covered under this policy. The surgical procedure must take place within 12 months of the mastectomy. This benefit includes:

- Breast Prosthesis
- Breast reconstruction
- Surgery to the opposite breast to achieve a symmetrical appearance (after unilateral mastectomy)
- Treatment for complication of mastectomy or reconstruction.

## RECONSTRUCTIVE SURGERY

Benefits are payable under this plan for any reconstructive surgery as a result of an Illness or injury which first occurred while covered under this policy. Reconstructive surgery must be performed within 12 months from the date of the accident.

Reconstructive surgery is not covered for congenital, hereditary or birth abnormalities for adults covered under this policy.



## OUTPATIENT REHABILITATION / THERAPEUTIC SERVICES

Benefit is covered for a condition resulting from injury or Illness covered under this policy. Medical records must be provided to establish the medical necessity. A treatment plan including the frequencies and duration must be provided and approved by the Plan Administrator prior to treatment taking place.

Services must be rendered by a physician or registered therapist.

### PHYSICAL THERAPY

Physical therapy will be covered up to the limits of the chosen plan. Services must be related specifically to the physician's written treatment plan.

### SPEECH THERAPY

Speech therapy will be covered up to the limits of the chosen plan. This excludes speech therapy for speech impediments or developmental delays.

### OCCUPATIONAL THERAPY

Occupational therapy will be covered up to the limits of the chosen plan

To learn or re-learn daily living skills (e.g., bathing, dressing, and eating) or compensatory techniques to improve the level of independence in the activities of daily living; or

To provide task-oriented therapeutic activities designed to significantly improve, develop or restore physical functions lost or impaired as a result of a disease, or injury.

## ORGAN TRANSPLANT

Coverage is provided for the transplant of any human organ or tissue in accordance with percentage and maximum allowable amounts as per Plan election.

The insured must notify The Company as soon as he or their Dependent is a candidate for Transplant. The organ transplant benefit begins once the need for it has been determined by a

provider, has been certified by a second surgical or medical opinion and has been approved by The Company.

The maximums set forth are inclusive of:
- Medical treatment for the living donor.
- All pre-transplant care, which includes services directly related to the evaluation that establishes the need for the transplant.
- The evaluation for the insured to undergo the transplant procedure and the medical stabilization of the insured to undergo the procedure.
- All pre-surgery test including labs, x-rays, CT scans, MRI's, ultrasounds, and biopsies. Prescription Medication and administration of the same. Procedure to transplant the organ.
- All post-transplant care directly or related to the transplant, including but not limited to follow-up care based on medical necessity of the transplant and or any complications directly or indirectly or as a consequence of the transplant.
- Any medication or therapeutic treatments required to secure and maintain the transplanted organ healthy.

This benefit is subject to a 12-month Waiting Period, subject to pre-certification and pre-approval in writing by the Plan Administrator.

Benefits are payable for a medically necessary procedure performed while an Insured's coverage under this Policy is in effect during which:
- One or more Organs are surgically transplanted from a donor (living or deceased), to an Insured as the recipient; or
- Tissue is surgically transplanted to an Insured from;
- A donor (living or deceased); or
- The same Insured.

## ORGAN ACQUISITION

Expenses for the acquisition of an organ including but not limited to donor search fees, typing, harvesting, transportation and administration and donor transplant tissue storage fees and donor medical services are covered up to the maximum amount as per the schedule of benefits based on plan option election. This benefit counts towards and is inclusive of the Transplant Lifetime Maximum under the chosen plan option.

## INPATIENT/OUTPATIENT MENTAL / NERVOUS HEALTH

Benefits are covered in accordance to the limits of the chosen plan, and they are subject to a 12-month Waiting Period. All treatment under this benefit must be performed under the direct control of a Psychiatrist. Psychologists are covered only if a referral is provided by the psychiatrist and forwarded to the Plan Administrator prior to treatment with the psychologist taking place. Wellness Benefit for Children under the age of 19

This benefit is available for underage dependents, up to the maximum coverage provided by the chosen plan, without deductible and is subject to a 12-month Waiting Period.

This benefit includes, but is not limited to, immunizations (Diphtheria, Hepatitis B, Measles, Mumps, Pertussis, Polio, Rubella,



Tetanus, Varicella, Haemophilus Influenza B and Hepatitis), well child routine medical exams and child preventive care services, health history, development assessments, physical examinations, age related diagnostic tests.

## WELLNESS BENEFIT FOR ADULTS

This benefit is available, up to the maximum provided by the chosen plan, without deductible and is subject to a 12-month Waiting Period. This benefit includes, but is not limited to:

### ADULT FEMALE SCREENINGS
- Routine Mammogram
- Pap smear Screening
- Routine physical examinations to include office visit and routine lab work such as urinalysis
- Colonoscopy, when recommended by physician

### ADULT MALE SCREENINGS
- PSA Screening Test
- Routine physical examinations to include office visit and routine lab work such as urinalysis
- Colonoscopy, when recommended by physician

## MATERNITY

All costs associated to normal delivery, planned C-section, or Elective C-section of a Covered Maternity, including but not limited to hospital fees for mother and newborn, obstetrician fees or midwife fees, child birth, prenatal/delivery preparation classes, postnatal care and lactation lessons will be covered up to the limits of the chosen plan. This benefit is subject to a 10-month Waiting Period, and is available in plans with deductible options of $1,000 and $2,500 without deductible. For Deductible option of $5,000, the maternity benefit will be subject to deductible.

For options Care and Select this benefit is available through the purchase of an optional rider.

## COMPLICATIONS OF PREGNANCY AND BIRTH

In a Covered Maternity, coverage of Complications of Pregnancy is available up to the limits of the chosen plan. This benefit includes non-elective Cesarean section; ectopic pregnancy; spontaneous termination of pregnancy that occurs during a period of gestation in which a viable birth is not possible, and conditions that require Hospital Admission, whose diagnoses are distinct from pregnancy but are adversely affected by or are caused by pregnancy, such as:

[1] acute nephritis; [2] nephrosis; [3] cardiac decompensation and [4] missed abortion.

This benefit is also applicable to mothers with multiple births, pre-eclampsia, eclampsia, and gestational diabetes.

Complications of Pregnancy will not include false labor; occasional spotting; Physician prescribed rest during the period of pregnancy; morning sickness; hyperemesis gravidarum; and similar conditions associated with the management of a regular pregnancy that do not constitute a nosologically distinct Complication of Pregnancy, and their coverage is included in the regular maternity benefit.

Complications of birth include but are not limited to newborn conditions not related to congenital or hereditary disorders, such as prematurity, low birth weight, jaundice, hypoglycemia, respiratory distress, and birth trauma.

For options Care and Select this benefit is available through the purchase of an optional rider.

## ALTERNATIVE MEDICINE

Depending on the plan option selected, your plan offers coverage for: Accupuncture, Aromatherapy, Herbal Therapy, Magnetic Therapy, Massage Therapy, and Vitamin Therapy. This benefit is subject to deductible,  any dollar limits, or policy year limits, provided that treatment is for a medical condition covered by this policy.

## 9  ADDITIONAL PAYABLE BENEFITS

## CONGENITAL DISORDERS, BIRTH DEFECTS & HEREDITARY CONDITIONS

Benefit is available up to a lifetime maximum of $250,000.

Coverage up to the limits of the chosen plan will be provided for Congenital Conditions, Birth Defects and hereditary disorders, which are first diagnosed while covered under this policy.

Medical conditions not disclosed but whose diagnosis can be traced to birth will be excluded from coverage as pre-existing.

## DURABLE MEDICAL EQUIPMENT

Benefits for durable medical equipment will be covered under this plan (including but not limited to orthopedic braces, arm, neck, leg



and back braces, wheelchairs, and hospital beds) provided such durable medical equipment [DME] is:

- Prescribed by a Physician, and
- Customarily and generally useful to a person only during an illness or injury

The amount payable is based on the reasonable charge for the equipment, which meets the Insured's basic medical needs.

Allowable rental fees of the Durable Medical Equipment must not exceed its purchase price.

Charges for repairs of Durable Medical Equipment originally obtained under this Policy will be paid at 50% of the allowable reasonable and customary amount.

## PROSTHETIC LIMBS

Benefits will be provided under this plan when the prosthetic limb is needed as a result of a covered medical condition, or injury which first occurred after the effective date of the plan, if they are:

Prescribed by a Physician, and customarily and generally useful to a person only during an illness or injury.

This benefit includes artificial legs, arms and eyes. The amount payable is based on the reasonable charge for the basic equipment, which meets the insured's medical needs.

Special high performance prosthetics for sports or improvement of sport performance are not covered. Lifetime maximum is inclusive of charges for repairs of artificial limbs, which will be reimbursed at 50% up to the maximums allowed under the chosen plan's schedule of benefits.

## PRESCRIPTION MEDICATION

Prescription drugs are medications which are prescribed by a physician to treat a covered illness or injury and which would not be available without such prescription. Certain treatments and medications, such as vitamins, herbs, aspirin, cold remedies, experimental or Investigative drugs, or medical supplies even when recommended by a physician, do not qualify as covered prescription drugs. All medication must be FDA approved. Benefits are payable in accordance with the schedule of benefits percentage reflected and limited to $20,000 per policy year per insured.

## EMERGENCY DENTAL TREATMENT

Acute emergency dental treatment due to a serious accident requiring hospitalization will be covered up to the limits of the chosen plan. The treatment must be received within 120 days after the emergency event. Please note that coverage under this benefit does not extend to follow-up dental treatment, dental surgery, dental prostheses, orthodontics or periodontics.

## NON-PROFESSIONAL SPORT INJURIES

Benefits are provided up to the lifetime maximum of the chosen plan.

## EMERGENCY MEDICAL EVACUATION

In the event of a Life Threatening emergency, when appropriate treatment is not available locally, this policy provides Emergency Medical Air Transportation to the closest medical facility capable of providing the required care. Should treatment be available locally, but if the Insured chooses to be treated elsewhere, transportation expenses shall be the responsibility of the Insured. The Plan Administrator reserves the right to decide the medical facility to which the Insured shall be transported and the means of air transportation. If the person chooses not to be treated at the facility and location arranged by The Plan Administrator, then transportation expenses shall be the responsibility of the Insured. Plans Select and Elite also provide a lifetime benefit of $10,000 for the emergency transportation of one family member to accompany the Insured who has been evacuated. Emergency transportation ticket will be round-trip in economy class and must originate from the Insured's Country of Residence.

The policy also provides return travel ticket for Evacuee limited to economy class. This must be no later than five days after the member is discharged from inpatient stay at the hospital. Date of discharge is determined by the hospital invoice. This benefit is strictly on a pay and claim basis. All invoices must be properly itemized and substantiated with proof of payment. No reimbursement will be made without proper documentation. This benefit is strictly conditional and must be approved in writing by the Plan Administrator.

This benefit is available up to the limits of the chosen plan.

## REPATRIATION OF MORTAL REMAINS

In the event of death outside of the Home Country from an eligible medical condition, this policy covers:

- Costs of transportation of body or ashes of an enrolled person to his Home Country.
- Expense is limited to expenses for embalming, a container legally appropriate for transportation, shipping costs and necessary government authorizations, or
- Burial or cremation costs at the place of death in accordance with reasonable and customary practice.

This benefit must be approved and coordinated by the Plan Administrator. This benefit is subject to the limits of the plan option elected. Original death certificate must be provided to the Plan Administrator with copies of any member paid burial or cremation services when requested for reimbursement.



## ROUTINE VISION

For Elite plan option only: includes one routine eye examination every two years, and coverage for eye glasses or contact lenses once every two years.

## DENTAL CARE

Subject to a 6-month waiting period.

Class A – Oral exams once every 6 months. This includes: prophylaxis and cleaning of teeth. Topical application of sodium or stannous fluoride for persons under 15 years of age. Emergency palliative treatment. First installation of a space maintainer for persons under 19 years of age to replace any baby tooth, which is lost prematurely. X-rays for diagnosis. Also other X-rays not to exceed: one full mouth series in a 36 month period; and one set of bitewings in a 6 month period.

Class B – Non-surgical extractions. Fillings. Injection of antibiotic drugs. Repair of re-cementing of crowns, inlays, bridgework or dentures. General anesthetics given in connection with covered dental services. Non-surgical endodontic treatment. This includes root canal therapy. Relining or rebasing of dentures not to exceed one of these in any 36 consecutive month period. Neither of these is covered for the six months after the denture is first installed or replaced.

Class C – Extra coronal and other splinting when a necessary part of complete periodontal treatment. Inlays, onlays, gold flings or crowns. This includes precision attachments for dentures. First installation of fixed bridgework to replace one or more natural teeth extracted while the person is covered. This includes inlays and crowns as abutments.Replacement of an existing removable denture or fixed bridgework by new fixed bridgework, or the adding of teeth to existing fixed bridgework. First installation of removable dentures to replace one or more natural teeth extracted while the person is covered. This includes adjustments for the 6-month period following the date they were installed. Replacement of an existing removable denture or fixed bridgework by a new denture, or the adding of teeth to a partial removable denture.

## 10 EXCLUSIONS AND LIMITATIONS

All services and benefits described below are excluded from coverage or limited under your policy of Insurance.

1.  Charges in excess of Usual, Customary and Reasonable for any covered procedure.
2.  Any medical condition or related condition arising within the first thirty (30) days from the Policy Effective Date, where such medical condition has not been as a result of an Accident or Infectious Disease, unless the Waiting Period has been waived.
3.  Services, supplies or treatment including drugs and/or emergency services that are provided by or payment is available from Workers' Compensation law, Occupational

Disease law or similar law concerning job related conditions of any country
4.  Experimental and/or investigational services or supplies
5.  Any services, supplies, treatments including drugs and/or emergency air services; Not ordered by a Physician; Not medically necessary, not recommended or approved by a physician; Not rendered under the scope of the Physician's licensing, or; Medical and dental services that do not meet professionally recognized standards or are determined by Insurer to be unnecessary for proper treatment; Not coordinated or approved by the Plan Administrator
6.  Telephonic consultations, missed appointments, or "after hours" expenses.
7.  Personal comfort and convenience items including but not limited to, television, master suites, movies, housekeeping services, guest meals and accommodations, special diets, telephone charges, take home supplies, and all other services and supplies that are not medically necessary.
8.  Health check-ups, and tests necessary for administrative purposes (e.g., determining insurability, employment, school or sport related physical examinations, travel etc.). Other than provided for under the Wellness benefit.
9.  Over-the-counter (OTC) drugs, supplies or medical devices, which do not require a Physician prescription, even if recommended by a Physician, including but not limited to; smoking cessation drugs, appetite suppressant, hair regenerative drugs or products, anti-photo aging drugs, cosmetic and beauty aids, acne and rosacea drugs (including hormones and Retin-A) for cosmetic purposes, mega vitamins, vitamins, sexual enhancement devices, supplements, herbs or drugs, for any reason.
10.  Routine eye examinations, services and supplies related to visual therapy, Radial keratotomy procedures, Lasik, or eye surgery to correct refractive error or deficiencies, including myopia or presbyopia. Routine vision exams, eyeglasses, contact lenses, sunglasses, unless specified otherwise in the Schedule of Benefits.
11.  Any admission to a nursing home, home for the aged, long term care or rehabilitation facility, sanatorium, spa, hydro clinic or similar facilities that do not meet the policy definition of a hospital, including rest cures, custodial care, home-like care, assistance with Activities of Daily Living (ADL), milieu therapy. Any admission, arranged wholly or partly for domestic reasons, where the hospital effectively becomes or could be treated as the Insured's home or permanent abode.
12.  Elective and or cosmetic procedures, treatments, drugs and supplies that are not medically necessary treatment of a covered accidental injury or illness or disease, and that may only be provided for the purpose of beautification or improving an existing condition including but not limited to treatment for Vitiligo; treatment or surgery for superficial varicose veins, spider veins, or non- keloid scars; tattoo removal or other skin discoloration; treatment for hair loss, breast surgery, except in connection with a mastectomy covered by this policy; treatment of superficial, non-cystic or non-pustular acne or rosacea; treatment or removal of benign skin lesions not demonstrating evidence of



suspicious cellular activity, or recent changes in size, shape, & color.

13. Surgical treatment of nasal deformities or deviated septum or medical conditions related to them except as a result of an Accident covered by this Policy.

14. Any treatment or services for any insomnia sleep disorder sleep studies and other treatments relating to sleep apnea, jet lag, fatigue, or work related stress or any related conditions.

15. Smoking cessation treatments whether or not recommended by a Physician.

16. Weight Reduction and the cost of all treatments, supplies, services or drugs for weight reduction or weight reduction programs, even if recommended by a physician. Diets, weight loss programs and educational dietary counseling related to weight loss efforts.

17. Expenses related to bariatric surgery and its complications.

18. Organ transplants excluded expenses include, but are not limited to:

    a) All expenses of cryopreservation

    b) Transplant that includes artificial mechanical equipment or artifacts designed to replace human organs

    c) Animal organs

19. Services or supplies that promote conception including but not limited to any fertility/infertility services, tests, treatments and/or procedures of any kind, including, but not limited to, fertility/ infertility drugs, including drugs to regulate the menstrual cycle/ovulation for family planning purposes, artificial inseminations, in-vitro fertilization, gamete intrafallopian transfer (GIFT), zygote intrafallopian transfer (ZIFT), surrogate mother and all other procedures and services related to fertility and infertility. Complication of the resulting pregnancy, the delivery or the C-Section, or any other complications directly or indirectly related to this exclusion.

20. Related to genetic medicine, genetic testing or screening and preventative prophylactic surgeries recommended by genetic testing.

21. Elective abortions and complications thereof, any voluntary induced termination of pregnancy,

22. Circumcisions, unless medically necessary.

23. "Viagra" or other sexual enhancement drugs and their respective generic equivalents.

24. Reproductive treatments including but not limited to male and female birth control, vasectomies and sterilization and any expenses for male or female reversal of sterilization. Treatments for sex change, procedures or treatments to change characteristics of the body to those of the opposite sex. This includes any medical, surgical or psychiatric treatment or study related to sex changes or implantation or treatments for sexual transformation, sexual dysfunctions or inadequacies including therapy supplies or counseling.

25. Hearing aids and devices and bone anchored hearing aids.

26. Treatment for alcoholism, solvent abuse, drug abuse or addictive conditions of any kind. This includes but is not limited to treatment for any injuries caused by, contributed to or resulting from the Insured's use of alcohol, illegal drugs, or any drugs or medicines that are not taken in the dosage or for the purposed prescribed by the Insured's Doctor.

27. Treatment for any conditions as a result of self-inflicted illnesses or injuries, suicide or attempted suicide, while sane or insane, or emergency air services for the same, and expenses associated with conditions as a result of travel, where an insured has traveled against medical advice.

28. Injuries and/or illnesses resulting or arising from or occurring during the commission or perpetration of a violation of law by an Insured.

29. Treatment directly or indirectly arising from or required as a result of chemical contamination or contamination by radioactivity from any nuclear material whatsoever or from the combustion of nuclear fuel, asbestosis or any related condition.

30. Dental care including, orthodontic treatment and any and all treatment relating to any gum disease, unless specified otherwise in the Schedule of Benefits.

31. Treatment of disorders of the upper maxillary, jaw and temporomandibular joint, including, but not limited to Temporomandibular Malocclusion Joint Disorders (TMLD) and Temporomadibular Joint syndrome (TMJ), except for injuries occurred in a covered accident or covered illness.

32. Prosthesis and corrective devices, which are not inserted in a surgical procedure; except appliances meeting the covered categories of durable medical equipment or prosthesis, in addition to the benefits provided by chosen plan.

33. Motor driven wheelchairs or bed; additional wheels; comfort items such as telephone arms and over bed tables; items used to alter air quality or temperature such as air conditioners, humidifiers, dehumidifiers, and purifiers (air cleaners); disposable supplies; exercycles, sun or heat lamps, heating pads, bidets, toilet seats, bathtub seats, sauna baths, elevators, whirlpool baths, exercise equipment, except as provided by the Durable Medical Equipment benefit; and similar items or the cost of instructions for the use and care of any durable medical devices. The customizing of any vehicle, bathroom facility, or residential facility.

34. Routine podiatry or other foot treatment not resulting from an illness or injury. Podiatric care including, but not limited to, structural and functional treatment of the feet, the treatment of weak arches, weak, strained or flat feet, corns, calluses, bunions or toenails, symptomatic complaints of the feet, congenital foot disorders, orthopedic shoes or other supportive devices for the feet, such as, but not limited to, arch supports and orthotic devices and shoe inserts of any kind, or any other preventative services and supplies, except for injuries sustained in a covered accident or illnesses covered by this policy.

35. Growth Hormones, any treatment by a bone growth stimulator, bone growth stimulation or Treatment relating to growth hormone.

36. Professional services self-administered or received from a person who lives in the member's home or a Family Member.

37. An Injury or Illness due to



a) Martial law or state of siege, or any event or causes which determine the proclamation or maintenance of martial law or state of siege;

b) Participation in civil commotion or an illegal act, mutiny, riot, strike, military or popular uprising, insurrection, rebellion, military or usurped power; including resultant imprisonment;

c) Any act of any person acting on behalf of or in connection with any terrorist organization;

d) War or any act of war declared or undeclared.

38. Any non-declared Pre-existing Condition.

39. Treatment for learning difficulties, hyperactivity, attention deficit disorder, or any developmental and behavioral problems. Any care for autistic disorder of childhood, hyperkinetic syndromes, learning disabilities, behavioral problems, mental retardation and eating disorders.

40. Alternative Medicines, unless otherwise specified in the chosen plan, are not covered. Non covered services include, primal therapy; Rolfing; psychodrama; bioenergetic therapy; or carbon dioxide therapy, homeopathy, aroma therapy, herbal therapy, Bio-electromagnetic, magnetic therapy, massage therapy, vitamin therapy, naturopathic medicine, ayurvedic medicine, Biofield therapies, energy medicines, color puncture, light therapy, hypnotherapy, osteopathy, reflexology, spiritual healing, Tai Chi, traditional oriental medicine, chelation therapy. This is not an all-inclusive list.

41. Sexually transmitted disease, including but not limited to: Chlamydia, Gonorrhea, Genital herpes, Human Papillomavirus (HPV), syphilis

42. Treatment of Acquired Immune Deficiency Syndrome (AIDS), Human Immunodeficiency Virus (HIV), or Aids Related Complex (ARC).

43. Any injuries or treatment resulting from the participation in a Professional Sport.

44. Services for which you are not legally obligated to pay for or services which no charge is made to you in the absence of insurance coverage.

45. Services related to a condition or injury not covered by this policy

46. Services, supplies or treatment including drugs and/or emergency services that are provided by any governmental institution or under the direction of public authorities. This includes services related to epidemics.

47. Any pregnancy or complications of pregnancy expenses relating to a dependent child.

**Important Notice Regarding Patient Protection and Affordable Care Act (PPACA):** This insurance is not subject to, and does not provide benefit required by, PPACA. Please note that it is solely the Insured's responsibility to determine if PPACA is applicable to you in order to avoid tax penalties that may be imposed on U.S. citizens and U.S. residents who are required to maintain PPACA compliant coverage but do not do so.

## 11 CLAIMS ADMINISTRATIVE PROCEDURES

In order for claims payment to be made, the policyholder must submit a claim form, which may be obtained from the PA Group member portal at portal.pagroupco.com.

For most Hospital admissions, we will provide direct settlement to the Hospital. In such cases, The Insured will continue to be responsible for all non-covered expenses including, but not limited to deductible amounts and percentage payable or any amounts in excess of Usual, Reasonable and Customary fees.

The claims may be submitted to Insurer directly by the medical institution within one hundred eighty (180) days from the date of service. No benefits will be paid for claims exceeding this time period.

Copies of invoices and receipts are accepted as long as the integrity of the document is not altered.

Claims may be submitted via your member portal, e-mail to claims@pagroupco.com, courier, or by Postal Service.

In the event the Primary Insured is deceased, the Plan Administrator will pay any unpaid benefits to the spouse as named in the application. If no spouse is named, any unpaid benefits will be paid to the deceased Primary Insured's estate. In the event of a divorce, all payments are payable to the Primary Insured unless a divorce decree or court order indicates otherwise.

## RELEASE OF MEDICAL RECORDS

The Plan Administrator will attempt to retrieve the medical records on behalf of the Insured. However, if these are not provided to Us, it will be the responsibility of the Insured to provide the information within 90 days in order to validate the claim. It is the duty of the Insured to provide authorization to release medical records. Claim will be closed with non-payment until the required information is provided to Us. Expenses incurred for such records will be at the sole expense of the Insured.

## REQUEST FOR REPRODUCTION OF RECORDS

Medical information such as claims invoices, explanation of benefits, and pre-certification are available free of charge by logging into the member portal at portal.pagroupco.com.

## CURRENCY

All values in this policy are in US Dollars.



## EXCHANGE RATE

For bills issued in currencies other than U.S. dollars, the exchange rate used will be determined by the Company based on the date the services were rendered.

## OVERPAYMENTS

We may recover benefit payments made erroneously and may supply subsequent benefits otherwise payable to offset any overpayment. We reserve the right to deduct overpayments made in error to a provider on behalf of an insured from a member reimbursement claim.

Deduction of an overpayment to a member will be properly documented on the explanation of benefits.

## RIGHT OF EXAMINATION

The Insurer and the Plan Administrator reserves the right, through our medical representatives, to examine any person whenever and as often as We may reasonably require within the duration of any claim. The Insured shall make available all medical reports and records, as well as requested health information questionnaires, and where required, shall sign all authorization forms necessary to give Us a full and complete medical history.

Failure to comply with this clause will result in automatic denial of all related claims.

## RIGHT TO RECOVERY

A right of recovery provision does not deal with substitution of rights but merely allows the plan to have a lien against the proceeds of any recovery made from a responsible third party. The right of recovery is usually enforced through direct.

## COORDINATION OF BENEFITS

When an Insured has coverage under another insurance contract, including but not limited to health insurance, Medicare, Medicaid, worker's compensation insurance, automobile insurance (whether direct or third party), and disability coverage, and a service received is covered by such contracts, benefits will be reduced under this Policy to avoid duplication of benefits available under the other contract including benefits that would have been payable had the Insured claimed for them. In no event will more than 100% of the Allowable Charge and/or maximum benefit for the covered services be paid or reimbursed. It is the duty of the Insured to inform Us of all other coverage.

United States citizens who are eligible for U.S. Medicare benefits must apply for coverage under those benefits for medical and prescription services obtained within the U.S. The insurer has full right of Subrogation. To determine the Primary Policy, the following guidelines will be used:

- If an Insured has local coverage in the Host Country, the local coverage would be primary for the services incurred locally

over this plan. This plan would be secondary and our liability would only be the amount not covered by the primary carrier subject to the satisfaction of deductible and co-insurance maximums as chosen under this policy.
- If the Insured has two International policies, the policy that has been in effect with the longest effective date would be primary.

## SUBROGATION

When the Company pays for expenses that were either the result of the alleged negligence, or which arise out of any claim or cause of action which may accrue against any third party responsible for injury or death to the Insured or his Insured Dependents by reason of their eligibility for benefits under the Plan, the Insurer has the right to equitable restitution and will advance benefits if the Insured agrees to the following.

- The Insured, and his attorney, for the exclusive benefit of the plan, must hold any settlement received, in trust.
- The Insured will reimburse the Company out of the Insured's recovery for all benefits paid by the Plan. The Company will be reimbursed in full prior to the Insured receiving any monies recovered from any party or their insurer as a result of judgment, settlement or otherwise. The duty and obligation to reimburse the Plan also applies to any money the Insured receives from any underinsured or uninsured motorist policy of insurance. The Insured is obligated to repay the Insurer even if the Insured is not fully compensated or made whole from any money they receive. The Insured must include the Plan's name as a co-payee on any settlement check. The Plan is paying benefits in reliance upon the Insured's agreement to the terms contained in this section.
- The Company has the right to the Insured's full cooperation in any case involving the alleged negligence of a third party. In such cases, the Insured is obligated to provide Us with whatever information, assistance and records that We may require to enforce the rights in this provision. The Insured further agrees that in the event that the Insurer has reason to believe that the Plan may have a subrogation lien, We may require the Insured to complete a subrogation questionnaire, sign an acknowledgment of the Plan's Subrogation rights and an agreement to provide ongoing information before the Plan Administrator pays, or continues payments of claims according to its terms and conditions. Upon receipt of the requested materials, the Plan will commence, or continue, payments of claims according to its terms and conditions provided that said payment of claims in no way prejudices the Company's rights.
- The Insurer may, but is not obligated to, take any legal action it sees fit against the third party or the Insured, to recover the benefits the Plan has paid. The Insurer's exercise of this right will not affect the Covered Person's right to pursue other forms of recovery, unless the Covered Person and his legal representative consent otherwise.
- In the event that the Claims payer determines that a subrogation recovery exists, the Plan Administrator retains the right to employ the services of an attorney to recover money due to the Plan. The Insured agrees to cooperate with the attorney who is pursuing the subrogation recovery. The



compensation that the Plan Administrator's attorney receives will be paid directly from the dollars recovered for the Plan.
- The Insurer specifically states that it has no duty or obligation to pay a fee to the Insured's attorney for the attorney's services in making any recovery on behalf of the Insured
- The Insured is obligated to inform their attorney of the subrogation lien and to make no distributions from any settlement or judgment which will in any way result in the Insurer receiving less than the full amount of its lien without the written approval of the Plan Administrator.
- The Insured further agrees that he will not release any third party or their insurer without prior written approval from the Plan Administrator, and will take no action that prejudices the Plan's subrogation right.
- The Insured agrees to refrain from characterizing any settlement in any manner so as to avoid repayment of the Insurer's lien or right to reimbursement.
- The Insurer retains discretionary authority to interpret this and all other plan provisions and the discretionary authority to determine the amount of the lien.
- The plan pays secondary to any and all Personal Insurance Protection (PIP), Medical Payment to Others (Med-Pay) or No-Fault coverage. The Insurer has no duty of obligation to pay any claims until PIP, Med-Pay or No-Fault coverage is exhausted. In the event that the Plan Administrator pays claims that should have been paid by PIP, Med-Pay or No-Fault coverage under this provision, then the Insurer has a right of recovery from the PIP, Med-Pay or No-Fault carrier.

## 12  HOW TO FILE A CLAIM

Claims Forms are downloadable from portal.pagroupco.com

Members may submit the claims the following way:
- Via the online member portal
- Via e-mail by sending to claims@pagroupco.com
- Fax at 305-443-9671
- US Postal Mail addressed to:
  **PA Group Administration**
  1901 Ponce De Leon Blvd.
  Coral Gables FL 33134

## STATUS OF CLAIMS

Members may view claims status via their member portal or may also send inquiries by e-mail to claims@pagroupco.com.

## 13  CLAIMS APPEALS PROCEDURES

The Company will provide a written explanation of the reason if it denies, in whole or in part, a claim for benefits under this Policy. If there is any question about the settlement or denial of a claim,

the Insured will have the right to request a full and fair review of that claim.

The process is as follows:
- Within sixty (60) days of receiving a claim denial, The Insured must write to the Company or Policyholder stating the reasons for the appeal and any additional information to support the claim;
- The Insured must include in the appeal: the Policy number; the Insured's name for whom the claim was made; the Provider; the amount of the claim; the date the claim was made; and the date it was denied;
- The Plan Administrator will set up the appeal for an independent review board to review the case and provide the recommendation to the Insurance company
- Within a further sixty (60) days of receiving the written appeal, the Company or Policyholder will notify the Insured by mail of the final decision and the specific reason for the decision. If more extensive review is required, a final decision will be made within one hundred twenty (120) days from the date the appeal is received in writing by the Company or Policyholder; all correspondence regarding claim appeals should be sent to our Plan Administrator.

## 14  DEFINITIONS

Certain words and terms used in this Policy are defined below. Other words and terms may be defined where they are used.

**ACCIDENT** – means an unforeseen, unexpected, and unintentional event due exclusively to an external cause of a violent nature beyond the control of the Insured, resulting directly and independently of all other causes, in bodily trauma to the Insured for which result in placing the Insured's life or physical integrity in immediate danger if medical attention is not provided immediately.

**ACT OF TERRORISM** – means an act, or acts, of any person, or group(s) of persons, committed for political, religious, ideological or similar purposes with the intention to influence any government and/or to put the public, or any section of the public, in fear. Terrorist activity can include, but are not be limited to, the actual use of force or violence and/or the threat of such use. Furthermore, the perpetrators of terrorist activity can either be acting alone, or on behalf of, or in connection with any organization(s) or government(s).

**ACTIVITIES OF DAILY LIVING (ADL)** – means those activities normally associated with the day- to-day fundamentals of personal self-care, including but not limited to: walking, personal hygiene,



sleeping, toilet/continence, dressing, cooking/feeding, medication and transferring (getting in and out of bed).

**ACUPUNCTURE** – means treatment of a medical condition, which is covered under the terms of this policy, by needles or laser provided by or ordered by a licensed physician as defined in this policy.

**ACUTE CARE** – means medically necessary, medical condition, which is brief, has a definite end point and which we, on medical advice, determine responds to and can be cured by treatment.

**ADMISSION** – means the period from the time that an Insured enters a Hospital, Extended Care Facility or other approved health care facility as an inpatient until discharge.

**AIR AMBULANCE** – means an aircraft specially equipped with the necessary medical personnel, supplies and Hospital equipment to treat life-threatening Illness or Injury for persons whose conditions cannot be treated locally and must be transported by air to the nearest medical center that can adequately treat their conditions. This service requires pre-certification.

**ALTERNATIVE MEDICINE** – means a variety of therapeutic or preventative health care products that do not follow generally accepted medical methods and may not have a scientific explanation for their effectiveness, including, but not limited to: Acupuncture, homeopathy, aroma therapy, herbal therapy, Bioelectromagnetic, magnetic therapy, massage therapy, vitamin therapy, naturopathic medicine, Ayurveda, Biofield therapies, energy medicines, color picture, light therapy, hypnotherapy, osteopathy, massage therapy, reflexology, spiritual healing, Tai Chi, traditional oriental medicine, chelation therapy, etc.

**AMBULATORY SURGICAL CENTER** – means a facility which: (a) has as its primary purpose to provide elective surgical care; and (b) admits and discharges a patient within 24 hours. "Ambulatory Surgical Center" does not include: (1) any facility whose primary purpose is the termination of pregnancy; (2) an office maintained by a Physician for the practice of medicine; or (3) an office maintained by a Dentist for the practice of Dentistry.

**ANNIVERSARY DATE** – Annual occurrence of the Effective Date of the Policy.

**ANNUAL MEDICAL EXAMINATION** – means a medical examination that takes place outside of a Hospital as part of the Person's regular wellness examination, which is not for the purpose of the diagnosis, and treatment of an Accident, Illness, or Injury.

**APPLICATION FORM** – means the form either written or electronic that was completed and signed by the Insured to request insurance coverage under this Policy.

**BODILY INJURY** – means an injury, which is caused solely by an accident, which results in the insured's dismemberment, disablement or other physical external injury.

**CHIROPRACTIC SERVICES** – means therapy including modalities provided by a licensed Chiropractor.

**CHIROPRACTOR** – means any person who is legally licensed to practice Chiropractic services in the country where treatment is provided.

**CHRONIC CONDITION** – means an injury, illness or condition which may be expected to be of long duration without any reasonably predictable date of termination, and which may be marked by recurrences requiring continuous or periodic care as necessary.

**CO-INSURANCE** – means the specific amount or percentage of the Covered Expenses, which must be paid by the Insured. The actual percentages are shown on the Schedule of Benefits.

**CONGENITAL CONDITION** – means any heredity condition, birth defect, physical anomaly and/or any other deviation from normal development present at birth. These deviations, either physical or mental, include but are not limited to, genetic and non-genetic factors or inborn errors of metabolism.

**CO-PAYMENT** – means the specific amount of the Covered Expenses, independent of deductible and co-insurance, which must be paid by the Insured as shown on the chosen plan.

**COVERED MATERNITY / COVERED PREGNANCY** – means a pregnancy that ends after the maternity waiting period stipulated in the Certificate of Coverage. This waiting period starts on the Effective Date of coverage of the female Policyholder or Insured Dependent spouse only. There is no Covered Maternity in Care and Select plans, except when the maternity rider is purchased.

**CRITICAL CONDITION** – means an immediate life threatening or perilous illness or conditions due to an accident or natural causes, which requires urgent specialized treatment without delay.

**CUSTODIAL CARE** – means and includes (1) the provision of room and board, nursing care, or such other care which is provided to an individual who is mentally or physically disabled and who, as determined by the individual's attending Physician, has reached the maximum level of recovery; and (2) in the case of an admitted person, room and board, nursing care or such other care which is provided to an individual for whom it cannot reasonably be expected that medical or surgical treatment will enable him to live outside an institution; and (3) rest cures, respite care and home care provided by family members. Upon receipt and review of a claim, the Insurer or an independent medical review will determine if a service or treatment is Custodial Care.

**DEDUCTIBLE** – means the Individual Annual Deductible, as set forth in the Schedule of Benefits, and which is the amount of covered



charges payable by the Insured during each Policy Year before the policy benefits are applied. Such amount will not be reimbursed under the Policy.

**DEPENDENT** – means a member of the Insured's family who is enrolled under the policy with the Company after meeting all the eligibility and requirements and for whom premiums have been received by the Company (See Eligibility and Conditions of Coverage Section).

**DIAGNOSIS** – means the determination by a Physician or specialist of the nature of a disease or condition made from a study of the signs and symptoms of a disease or condition.

**DURABLE MEDICAL EQUIPMENT (DME)** – means equipment prescribed by a Physician, designated for repeat and prolonged use and which is Medically Necessary to improve the functioning of a malformation of the body, treatment of an Illness, or to prevent further deterioration of the Covered Person's medical conditions. DME includes non-motorized wheelchairs, Hospital beds, respirators and such other items as determined by the Company.

**EFFECTIVE DATE** – means the date coverage begins under this Policy, as indicated in the Certificate of Coverage.

**ELECTIVE** – means any care, service, treatment, or surgery performed at the choice of the patient, for which there is no Medical Necessity, and/or which does not treat an Accident, Illness, or Injury (such as care provided primarily as a convenience or to improve or preserve appearance, self-esteem or future possible effects on health, posture or body function).

**EMERGENCY** – means the sudden and unexpected onset of a medical condition accompanied by acute signs or symptoms, which could reasonably result in placing the Insured's life or physical integrity in immediate danger if medical attention is not provided immediately.

**EMERGENCY DENTAL TREATMENT** – means an acute emergency dental treatment due to a serious accident requiring hospitalization. The treatment must be received within 120 days of the emergency event. Please note that cover under this benefit does not extend to follow-up dental treatment, dental surgery, dental prostheses, orthodontics or periodontics.

**EMERGENCY MEDICAL SERVICES** – means the initial treatment of a sudden onset of a medical condition with acute symptoms of sufficient severity that in the absence of immediate medical attention (or as soon thereafter as care can be made available, no later than seventy-two (72) hours after the onset) and in the absence of which care an Insured could reasonably result in:
- Permanently placing the Insured's health in jeopardy;
- Causing other serious medical consequences;
- Causing serious impairment to bodily functions; or
- Causing serious and permanent dysfunction of any bodily organ or part
- Causing loss of life or limb
- Or death

**EMERGENCY MEDICAL TRANSPORTATION** – means the transfer of a patient to the nearest hospital in the event of a Life Threatening Emergency, when appropriate treatment is not available locally. This policy provides Emergency Medical ground or air transportation to the closest medical facility capable of providing the required care.

**EXPATRIATE** – A person living outside their Home Country.

**EXPERIMENTAL AND/OR INVESTIGATIONAL** – means any treatment, procedure, technology, facility, equipment, drug, drug usage, device, or supplies not recognized as accepted medical practice in the United States or by Insurer or supply that fails to meet the following criteria:
- Such service or supply is in accordance with generally accepted standards of medical practice in the United States of America; or
- At the time such service or supply is received by a Insured Person, it has been approved for the particular indication or application in question by the United States Food and Drug Administration (FDA) or other federal or state governmental agency whose approval is required in the United States, regardless of where the medical expenses are incurred.

**EXTENDED CARE FACILITY** – means a nursing and/or rehabilitation center approved by Insurer that provides skilled and rehabilitation services to patients who are discharged from a Hospital or who are admitted in lieu of a Hospital stay. The term Extended Care Facility does not include nursing homes, rest home, health resorts, homes for the aged, infirmaries or establishments for domiciliary care, custodial care, care of drug addicts or alcoholics, or similar institutions.

**FAMILY MEMBER** – means and is defined as to be a spouse, father, mother, sibling, child, grandchild, father in-law, mother in-law, aunt or uncle of the insured or domestic partner as reported under the medical application for coverage.

**HEREDITARY** – means transmitted from parents to offspring; inherited.

**HOME COUNTRY** - For U.S. citizens, the Home Country is the United States. For non-U.S. citizens, the Home Country is the country of which the Insured is a citizen and is the country of nationality declared in the application.

**HOME HEALTH CARE AGENCY** – means an agency or organization, or subdivision thereof, that; a) is primarily engaged in providing skilled nursing services and other therapeutic services in the Covered Person's home; b) is duly licensed, by the appropriate licensing facility; c) has policies established by a professional group associated with the agency or organization, including at least one Physician and one Registered Nurse, to govern the services provided; d) provides for full- time supervision of such services by a Physician or by a Registered Nurse, e) maintains a complete medical record on each patient; and f) has a full-time administrator.

**HOME HEALTH CARE PLAN** – means a program: a) for the care and treatment of an Insured in his home; b) established and approved in writing by his attending Physician; and c) Certified, by the attending Physician, as required for the proper treatment of the injury or illness, in place of inpatient treatment in a Hospital or in an Extended Care Facility.

**HOSPICE OR TERMINAL CARE** – means services provided by an agency which follows a coordinated plan of home and inpatient



care to a terminally ill person and which has obtained any required state or governmental license, provides service 24-hours-a-day, 7 days a week, is under the direct supervision of a Physician, has a nurse coordinator who is a Registered Nurse or a Licensed Practical Nurse, has as its primary purpose the provision of Hospice services, and maintains written records of services provided to the patient.

**HOSPITAL** – means and includes only acute care facilities licensed or approved by the appropriate regulatory agency as a hospital, and whose services are under the supervision of, or rendered by a staff of physicians who are duly licensed to practice medicine, and which continuously provides twenty-four (24) hour a day nursing service under the direction or supervision of registered professional nurses. The term Hospital does not include nursing homes, rest home, health resorts, and homes for the aged, infirmaries or establishments for domiciliary care, custodial care, care of drug addicts or alcoholics, or similar institutions.

**HOSPITAL ROOM AND BOARD** – means a private or semi-private Hospital Room as specifically approved by our Plan Administrator.

**HOST COUNTRY** - Means the Country declared in the Application where an Insured Person, and his Dependent(s) maintain legal domicile outside his Home Country.

**INJURY** – Means a bodily Injury caused by an Accident All injuries sustained by one person in any one Accident including all related conditions and recurrent symptoms of these injuries, are considered a single injury.

**INPATIENT** – means a person admitted to an approved Hospital or other health care facility for a medically necessary overnight stay in excess of 23 hours.

**INSURED** – means an individual for whom an application has been submitted and approved and for whom the required Premium has been paid.

**INSURER, OR COMPANY OR WE, US** – means Premier Assurance Group SPC Ltd (PA Group), on behalf of the Global Assurance Segregated Portfolio.

**MAJOR ACCIDENT** – means an Accident resulting in serious bodily injuries that require immediate hospitalization for more than 23 hours to avoid the loss of life or of physical integrity of the Insured.

**MEDICALLY NECESSARY** – means those services or supplies which are provided by Hospital, Physician or other approved medical providers that are required to identify or treat an illness or injury and which, as determined by Insurer, are:
- Are appropriate to the Diagnosis or Treatment of an Insured's Illness or Injury;
- Appropriate with regard to standards of accepted professional practice; and
- Not solely for the Insured's convenience, the Physician's convenience or any other provider's convenience, and
- The most appropriate supply or level of service, which can be provided. When applied to an inpatient, it further means that

the medical symptoms or condition require that the services or supplies cannot be safely provided as an outpatient; or
- Is not a part of or associated with the scholastic education or vocational training of the patient; and
- Is not Experimental or Investigative.

**NURSE** – means a person licensed as a Registered Nurse or Licensed Practical Nurse by the appropriate licensing authority in the areas which he or she practices nursing.

**NURSING SERVICES** – means Home nursing care (only payable if prescribed by attending physician and approved by the company). The service must immediately start after the patient is discharged from the Hospital. Services related to aid in the activities of daily living such as but not limited to bathing, clothing, eating, mobilization, etc., are not covered by the policy.

**OUTPATIENT SERVICES** – means medical services provided to an Insured Person, who is not admitted in a Hospital, to treat injuries or illnesses. Outpatient Services shall include, but are not limited to:
- Comprehensive diagnostic and evaluation services;
- Outpatient care and Treatment, pre-care, aftercare, emergency care, rehabilitation and supportive transitional services; and,
- Professional consultation.

**PALLIATIVE CARE** – means and refers to in-patient, day-care or outpatient treatment following the diagnosis that the condition is terminal and treatment can no longer be expected to cure the condition.

**PHYSICIAN** – means any person who is duly licensed and meets all of the laws, regulations, and requirements of the jurisdiction in which he practices medicine, who is acting within the scope of that license or certification; an Ambulatory Surgical Center or Hospital, Physician (M.D. or D.O.), a dentist (D.D.S. or D.M.D.), a Nurse Midwife or any other non-physician and non-dentist practitioner for whose services benefits are provided under this Policy. This term does not include; (1) an intern; or (2) a person in training.

**PODIATRIC CARE** – means a medical specialty concerned with the care and treatment of the feet.

**POLICY** – means the agreement between Insurer and the Policyholder. The Policy includes this document, the Certificate of Coverage, the applicable Schedule of Benefits, any application forms and any amendment or endorsement modification made in accordance with the Policy. This also includes any riders or endorsements purchased by the Policyholder.

**POLICYHOLDER** – means a person that has applied for coverage and is named as the Policyholder on the Certificate of Coverage of this Policy.

**POLICY YEAR** – means the period that begins on the Effective Date of the policy, which ends twelve (12) months later, and that, recurs for additional 12 months upon renewal of the policy.

**PRE-EXISTING CONDITION** – means any sickness, injury, or physical or mental abnormality for which signs or symptoms existed prior to the Effective Date. This condition is one that, prior to the Effective Date: 1) would cause an ordinary prudent person to seek diagnosis, care or treatment, or 2) needed medical advice or treatment, or 3)



required formal medical investigation, testing or examination, or 4] if presented to a physician would have resulted in the diagnosis or treatment of an illness, injury or abnormality, or 5] received medical advice or treatment.

**PREFERRED PROVIDER ORGANIZATION (PPO)** – means a network of participating providers, including Hospitals, clinics and Physicians that have entered into an agreement with the Company to provide health services to their Insured's.

**PREMATURITY OR PREMATURE INFANT** – means the delivery of a fetus before thirty seven (37) completed weeks of gestation.

**PREMIUM PAYMENT DUE DATE** – means the recurring date specified in the Certificate of Coverage upon which the Premium for this Policy is due. This is also the date the coverage ends if the policy is not renewed on time.

**PRESCRIPTION DRUGS** – means medications whose sale and use are legally restricted to the order of a Physician and which can only be obtained with a Physician's written Prescription, must be dispensed by a Physician or licensed pharmacist and approved by the FDA in the United States and cannot be obtained over the counter at a Pharmacy. Certain treatments and medications, such as vitamins, herbs, aspirin, cold remedies, medicines, experimental or Investigative drugs, or medical supplies even when recommended by a physician, do not qualify as prescription drugs.

**PROFESSIONAL SPORTS** – means sport activities in which the participants receive monetary compensation for their participation.

**PROVIDER** – means the organization or person performing or supplying treatment, services, supplies or drugs.

**RECONSTRUCTIVE SURGERY** – means the use of surgery that takes place due to a covered surgical procedure or accidental injury, and is Medically Necessary in order to maintain or restore normal bodily function.

**REHABILITATION** – means therapeutic services designed to improve a patient's medical condition within a predetermined time period through establishing a maintenance program designed to maintain the patient's current condition, prevent it from deteriorating and assist in recovery.

**REPATRIATION OR LOCAL BURIAL** – means the expense of preparation and the air transportation of the mortal remains of the Insured from the place of death to their Home Country, or the

preparation and local burial of the mortal remains of an Insured who dies outside his Home Country.

**RESPITE CARE** – means Inpatient care for a chronically ill or terminally ill patient, for the sole purpose of relieving the patients' primary caregiver; Assist in recovery.

**RESTRICTED AREA** – means countries and/or facilities, where direct settlement may not be available. Consult with the Plan Administrator for a complete list of restricted areas and facilities.

**SURGICAL IMPLANTS** – means an Internal Prosthesis or device inserted during a surgical Procedure, and is administered by a Physician or Specialist.

**SYMPTOMS** – means a sensation or feeling that the Insured may experience and consider not to be normal. Such feeling or sensation may be in the form of pain or change of bodily fluids. This symptom will not be considered an Illness or a medical condition until a licensed Physician or specialist gives a diagnosis.

**THERAPEUTIC SERVICES** – means physical therapy, occupational therapy or speech therapy.

**TRANSPLANT** – means the surgical procedure of one or more human organs or tissues moved from a donor (living or deceased), to an insured as the recipient or from the same insured person.

**USUAL, REASONABLE AND CUSTOMARY CHARGE** – means the lower of: a] the provider's usual charge for furnishing the treatment, service or supply; or b] the charge determined by the Insurer to be the general rate charged by others who render or furnish such treatments, services or supplies to persons: (1) whose Injury or Illness is comparable in nature and severity. The Reasonable and Customary Charge for a treatment, service or supply that is unusual, or not often provided in the area, or that is provided by only a small number of providers in the area, will be determined by the Insurer. The Insurer will consider such factors as: (1) complexity; (2) degree of skill needed; (3) type of specialist required; (4) range of services or supplies provided by a facility.

When PPO providers are not available within a 50-mile radius of the Insured's local residence, the Usual, Reasonable and Customary charge may be the negotiated PPO provider fee for such services.

The Insured is responsible for the payment of any balance over the Allowable Charge. All services must be medically necessary. Once an allowable charge is established then the deductible, and any excess charges must be paid by the Insured.

**WAITING PERIOD** – means the period of time beginning with the Insured's Effective Date, during which limited or no benefits are available for particular services. After satisfaction of the corresponding Waiting Period, benefits for those services become available in accordance with this plan.

**WORLDWIDE** – means coverage in all areas of the world.

**YOU, YOUR** – means the Policyholder.

This Policy in underwritten by Premier Assurance Group SPC Ltd. on behalf of the Global Assurance Segregated Portfolio, and registered in Grand Cayman, Cayman Islands.

Administration Services provided by Lyncpay, LLC [PA Group Administration].





© 2018 PA Group Administration. All rights reserved.

PA17_AH_EXP_BR_PW_E